# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-16-00395-CV

**Wylie Cavin; Lillian Cavin; and Eagle Radiology, PLLC, Appellants**

**v.**

**Kristin Abbott and William Abbott, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
NO. D-1-GN-16-000201, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING**

## O P I N I O N

This case illustrates that the Texas Citizens Participation Act (TCPA),[1] as written—and, therefore, as the Texas Judiciary must apply it—can be invoked successfully in the context of litigation arising from family tumult over an adult daughter's choice of a husband. Among our holdings, we are compelled to conclude that the TCPA's protections extend to—and, ultimately, require dismissal of claims complaining of—statements by the bride's parents that their daughter's suitor won her hand through use of "Marxist" brainwashing, hypnotic implantation of phobias and false memories, or similar mind-control tactics. (Although the bride's father contemporaneously acknowledged that these assertions "sound crazy," that is no bar to the TCPA's application as the statute is written and as the Texas Supreme Court has authoritatively interpreted it).

---

[1] *See* Tex. Civ. Prac. & Rem. Code §§ 27.001–.011.

Further, at least in the posture of this appeal, the TCPA also protects, and requires dismissal of claims concerning, *inter alia*, stalking by private investigators the parents hired, the father's alleged theft of the daughter's car, and the father's unfavorable comparison of the husband's physical appearance to a "dog's butt." But an express exception for bodily-injury claims prevents this "anti-SLAPP" law from similarly barring an assault claim predicated on an alleged violent attack by the father upon the daughter.

The district court denied TCPA dismissal under these circumstances and required the movants to pay attorney's fees. The net effect of our holdings is that we must affirm the district court's order only with respect to the assault claim, dismiss each of the other claims, and remand the issues of attorney's fees and sanctions.

**BACKGROUND**

The TCPA requires us to dismiss most of the couple's claims despite their presentation of evidence, attached as exhibits to their pleadings, that potentially would be compelling before a jury—chiefly, copies of dozens of "smoking gun" texts, emails, letters, and other writings generated by the parents that reflect an array of often-disturbing acts that form the basis for the couple's claims. The parents have not disputed the authenticity of these documents, nor otherwise opposed their inclusion in the record before the district court. Because these acknowledged words and deeds provide perhaps the best explanation of the unusual circumstances from which this case arises, we will draw from them extensively in the following summary.

Appellees Kristin and William (Bill) Abbott were married in the fall of 2014. Kristin is the daughter—and only child—of appellants Wylie and Lillian Cavin.[2] As Kristin's relationship with Bill progressed toward matrimony, the Cavins voiced strong parental disapproval of their daughter's choice of husband and attempted to intervene to prevent the union. At the time the Cavins asserted this gatekeeper role, Kristin was in her mid-20s, lived in a separate residence, and had graduated college about four years earlier. In the interim, Kristin had worked at the Public Utility Commission before leaving in 2013 to pursue a master's degree in the energy field at the University of Texas. The Cavins professed to perceive Kristin as uniquely vulnerable due to a hearing impairment, which requires her to wear hearing aids in both ears. The Cavins had also retained considerable sway in Kristin's adult life by continuing to subsidize her education, living expenses, and a car.

The Cavins' opposition to the relationship and a corresponding distancing of Kristin eventually led to a pivotal parent-daughter confrontation in Kristin's apartment in late February 2014. On that occasion, the parties agree, Kristin pointedly advised her parents that she would continue pursuing the relationship with Bill despite their wishes. A physical altercation ensued in which Wylie and Kristin both ended up on the floor, although the parties dispute who roughed up whom.[3] In the incident's aftermath, the Cavins would send texts accusing Kristin of disloyalty and

---

[2] Given the common surnames, we use first names for ease of reference.

[3] According to Kristin's version, Wylie tackled her to the floor, hurting her tailbone; pinned her arms above her head, causing further injury; and screamed in her face. The Cavins, in contrast, claim that Kristin had initiated the violence by grabbing Lillian in an effort to prevent her from making a phone call, prompting Wylie to restrain Kristin by holding her wrists. The pair ended up on the floor, Wylie would later aver, because Kristin "lifted her arms into the air as if to slip my grip, and when that didn't happen she intentionally fell back to the floor taking me down to the floor with

3

ingratitude toward them, and Lillian by phone accused Bill of "destroying" their family. Wiley also sent texts to Bill conveying both insults and threats.

With this prologue, Kristin continued to assert her autonomy from her parents during the weeks and months that followed.[4] She went on to marry Bill, as previously indicated, and in the meantime attempted (with mixed success) to cut off further contact from the Cavins, relocated her residence from her parent-funded apartment to Bill's apartment (she professed to fear further violence from Wylie, who apparently had access), and changed her surname from Cavin to Whitley (Lillian's maiden name) even before taking the Abbott surname upon the couple's marriage a few weeks later. She also opted to return to work at the PUC after leaving her graduate program, a departure from prior parentally approved plans to next pursue an MBA at a prestigious university in another city (the Cavins had placed considerable emphasis on Kristin's "upward path" toward becoming an executive in the electric power industry).

Meanwhile, as both a response to and further impetus for Kristin's assertions of independence, the Cavins escalated their efforts to disrupt Kristin's marriage plans and related life decisions. As reflected in their numerous writings, the Cavins pursued tactics that included hiring

---

her." "Feeling it was unsafe to move," Wylie continued, he remained on the floor while Kristin "was kicking me in the legs and knees," until she "calmed down," whereupon he rose and peacefully left the apartment. Incidentally, it appears undisputed that Wylie is approximately six inches taller than Kristin and outweighs her by upwards of sixty pounds.

[4] Kristin characterizes the altercation as her break from a longstanding pattern of intimidation and coercion that the Cavins—chiefly, Wylie—had wielded over her so as to compel obeisance to their wants and needs at the expense of subverting her own. In that regard, Kristin alleges that a similar outbreak of violence had occurred during her adolescence. On both occasions, Kristin claims, Lillian responded by downplaying or denying her trauma and also repeating insistently, "Does Daddy beat you? Does Daddy beat you?"

4

a private investigator in 2014 to research Bill's personal history, later using information they perceived unflattering to disparage Bill to Kristin and others. The Cavins also directed the investigator to surveil the couple and (as Wylie described it in an email to the investigator) to "rattle" Bill by making the investigator's presence known. After an investigator showed up at the PUC in June 2014, ostensibly to ascertain her welfare on her parents' behalf, Kristin filed a police report complaining of the investigator's "stalking" of her.

The Cavins also continued—contrary to Kristin's repeated requests and demands—attempting to contact her via text, email, or in-person confrontations. Among the latter was an incident on the University of Texas campus in April 2014, when Lillian showed up unexpectedly following one of Kristin's graduate-school classes, Kristin attempted to avoid Lillian, and an ensuing scene resulted in Lillian's arrest on assault charges.[5] Following the arrest, Wylie confiscated the car that Kristin used for transportation (he claimed to be the rightful owner, although the Abbotts dispute this), leaving her stranded afoot on the campus. Later that year, the Austin Police Department would issue a no-contact letter against the Cavins.

The Cavins further attempted to undermine support for the couple's union through numerous communications made to members of both their own and Bill's extended families. They similarly reached out to numerous friends and acquaintances of both the Cavins and Kristin individually. Additionally, after learning that Kristin had applied for re-employment at the PUC in lieu of the MBA program, Wylie wrote a letter to the agency's human-resources director in March 2014 to advise of the Cavins' preference that Kristin "continue with her original educational plans."

---

[5] The charges were later dismissed.

Wylie further insinuated that the agency bore some responsibility for the couple's "unhealthy relationship" because Bill, who also worked at the agency, had once been placed in a supervisory position over Kristin there.

Similarly, Lillian, who had persistently demanded that Kristin see a church-based counselor whom the Cavins had consulted, wrote a counselor whom Kristin had seen, disparaging Bill and urging the counselor to cooperate in securing a joint session with the Cavins' preferred counselor. In this letter, Lillian also emphasized her own qualifications and status as a medical professional—she is a medical doctor who practices radiology—and utilized the letterhead of the entity through which she practices, Eagle Radiology, PLLC.

The Cavins' numerous writings to Kristin, Bill, or third parties conveyed a variety of concerns and criticisms regarding Bill. Among these, the Cavins insinuated that Bill was seeking to exploit Kristin for her money[6] and otherwise questioned his general worthiness to wed their beautiful daughter (e.g, Wylie urging Kristin via email that she and Bill "look[] like a beautiful

---

[6] In a similar vein, Wylie, who has a law degree and evidently has prospered in banking and investments, and Lillian, who as previously indicated is a doctor, looked askance at the professional accomplishments and status of Bill, a man of comparatively modest means who had spent most of his early adulthood obtaining three undergraduate degrees (in psychology, chemistry, and economics) and a masters, purportedly while working part-time, before joining the PUC staff in 2010. As Wylie expressed this view in one of his texts to Kristin, Bill "has literally done NOTHING," and the Cavins further inferred that Bill must also have incurred substantial student debt from his many years of higher education.

The Cavins were also critical of an age difference (Bill was in his late 30s) and the fact that (per their investigator) Bill had never previously married. Perceived religious differences were also mentioned, as was worry that the marriage would impede Kristin's educational and career prospects as they saw them (the latter of which came to pass, in the Cavins' view, with her decision to resume employment at the PUC).

6

flower next to a pile of dogshit" and that he "could shave a dog's butt and teach him to walk backwards and he'd look better than Bill Abbott").

But the Cavins also advanced a less orthodox parental objection that also served as an alternative explanation for their daughter's alienation from them and disregard of their wishes. They professed an emphatic belief that Bill had a "sociopathic" or "narcissistic" psychological disorder and that he, aided by an educational background in psychology (one of his undergraduate degrees), had predatorily used "Marxist tactics," "re-education," "brainwashing," "implant[ing] thoughts, false memories, and phobias," or other means of psychological coercion to wield control over Kristin's mind and actions. The Cavins similarly deduced, as further explanation for Kristin's assertions of autonomy, that Bill had likely installed software enabling him to monitor Kristin's email and text communications and that Bill must have been the true author of emails or texts sent under Kristin's name. As Wylie acknowledged when explaining these theories to a relative, "If this is starting to sound crazy, that's exactly what it is," but the Cavins purported to believe them nonetheless.[7]

By early March 2014, Lillian had shown up at the PUC demanding to see the chief of staff and insisting that Bill was holding Kristin against her will. The Cavins' primary theme

---

[7] The Cavins' writings suggest that this view of Bill had originated in response to Bill's perceived reluctance to spend much time with his prospective in-laws, and they also emphasized that Kristin had purportedly not been fond of Bill initially, even finding him "creepy," before Bill eventually won her over. But the Cavins soon began insisting also that their theory of Bill as a malevolent, mind-controlling sociopath had been validated by their church-based counselor, and they would similarly come to cite various online resources regarding mind control or abuse in relationships.

7

thereafter was to the effect that both Bill and Kristin were mentally ill and had an "abusive relationship" maintained through Bill's mind-control tactics.

And these communications did not cease even after the couple married. Recurrences include a lengthy letter from Lillian to several of Kristin's friends in early 2015 and a March 2015 letter from Wylie to the PUC's HR director—on the one-year anniversary of his previous letter—purporting to request assistance in rescuing Kristin from her "abuse," and again insinuating that the agency bore some responsibility for placing Bill in a position to (as the Cavins portrayed the situation) prey on her.

The Abbotts eventually obtained counsel to help resist what they viewed as a malicious and rather bizarre campaign of harassment and retribution. In April 2015, counsel wrote Wylie demanding that Wylie retract alleged defamatory statements contained in his March 2015 letter to the PUC.[8] The letter also demanded that Wylie return the car that he had confiscated in April 2014, along with personal items belonging to Kristin that had been inside the vehicle.

Counsel's letter did not resolve matters. On the contrary, Wylie wrote the PUC a third time. And the Cavins took aggressive steps against persons they suspected of expressing views critical of their actions, such as by suggesting that the Cavins themselves could have mental-health issues or had engaged in abusive, controlling behavior. Complaining of alleged statements to this effect, the Cavins sued Lillian's sister, Sandy Whitley, and Sandy's husband, David Hayes, seeking $1 million each for defamation.[9] In addition, after obtaining through discovery emails between

---

[8] *See* Tex. Civ. Prac. & Rem. Code § 73.055.

[9] *See* No. D-1-GN-15-002890 (53rd Judicial Dist., Travis Cty.); No. D-1-GN-15-005750 (53rd Judicial Dist., Travis Cty.). The Cavins would later bring a similar suit against Bill, which was

8

Kristin and Sandy referencing advice purportedly provided to Kristin by a psychologist, Lillian wrote that provider a letter similar to her earlier missive to Kristin's counselor—again on Eagle Radiology letterhead and again touting Lillian's status and qualifications as a medical doctor—disputing any notion that Lillian herself had mental-health issues and threatening a professional disciplinary complaint to the extent the professional advised Kristin otherwise. And beginning in late 2015, the Cavins also began disseminating their "abusive relationship" narrative to the social-media audience, through a series of videos that Lillian posted online.

In January 2016, the Abbotts filed suit against the Cavins and, in connection with the two letters written by Lillian to health-care providers, Eagle Radiology (collectively, appellants), seeking money damages and injunctive relief. In their live petition, the Abbotts assert theories of defamation (complaining chiefly of appellants' numerous statements to third parties accusing the Abbotts of mental illness or "abuse"), conversion (based on Wylie's confiscation of the car and some personal items of Kristin's that were inside), tortious interference with existing contract (for the alleged disruption of Kristin's relationships with her counselor and therapist), abuse of process (for allegedly using discovery subpoenas in the Whitley suit merely to obtain fodder for their ongoing campaign of harassment and defamation), assault (based on the altercation in February 2014), intrusion-on-seclusion invasion of privacy (chiefly for the conduct of the Cavins' investigator), and intentional infliction of emotional distress (for appellants' other acts and communications that were threatening, harassing, or cruel). As support for their factual allegations, the Abbotts attached as

consolidated into the underlying cause. *See* No. C-1-CV-16-6741 (County Court at Law No. 1, Travis Cty.).

9

exhibits to their pleadings documentary evidence that included the numerous texts, emails, letters, and other written communications that appellants had generated in the course of their complained-of activities.

Appellants timely filed a motion under the TCPA seeking to dismiss the Abbotts' suit in its entirety. Appellants premised their dismissal motion primarily on the contention that their numerous statements about the Abbotts' mental health or "abuse" met the TCPA's definition of the "exercise of the right of free speech"[10] because these were "communication[s] made in connection with a matter of public concern," namely "health or safety."[11] Appellants also insisted that the Abbotts' claims implicated appellants' "exercise of the right to petition"—their lawsuits against Sandy Whitley and David Hayes and use of discovery subpoenas in those actions.[12] The Abbotts filed a response, urging, among other arguments, that the TCPA had no application to their suit and that their assault claim, regardless, fell within the Act's express exemption for "legal action[s] seeking recovery for bodily injury."[13]

Following the hearing, the district court denied appellees' motion in full. The order included express conclusions that the Abbotts' "assault claim . . . is expressly exempt from the

---

[10] *See* Tex. Civ. Prac. & Rem. Code § 27.003(a) (authorizing motion to dismiss "[i]f a legal action is based on, relates to, or is in response to a party's exercise of the right or free speech, right to petition, or right of association").

[11] *See id*. § 27.001(3) (defining "exercise of the right of free speech"), (7) (defining "matter of public concern"); *see also id*. § 27.001(1) (defining "communication"), (6) (defining "legal action").

[12] *See id*. § 27.001(4)(A)(i) (defining "exercise of the right to petition" to include "a communication in or pertaining to . . . a judicial proceeding").

[13] *See id*. § 27.010(c).

10

[TCPA], and [that] the other claims are not matters of public concern as a matter of law and [are] thus not covered." The court in its order also determined that appellants' motion had been "filed frivolously, based on the case law and the plain language of the [TCPA]," and exercised its discretion to award the Abbotts reasonable attorney's fees.[14] Based on evidence regarding a flat-fee arrangement between the Abbotts and their counsel, the court awarded them $1,000 as a reasonable fee.

This appeal followed.[15]

## ANALYSIS

In three issues, appellants urge that the district court erred in, respectively, (1) denying their motion to dismiss with respect to their "exercise of the right of free speech" predicate; (2) denying the motion to dismiss with respect to their "exercise of the right to petition" predicate; and (3) awarding the Abbotts attorney's fees.

The TCPA's basic features are well known by now. The Act professes an overarching purpose of "safeguard[ing] the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government" against infringement by meritless lawsuits,[16] and

---

[14] *See id*. § 27.009(b) ("If the court finds that a motion to dismiss filed under this chapter is frivolous or solely intended to delay, the court may award court costs and reasonable attorney's fees to the responding party.").

[15] *See id.* § 51.014(a)(12).

[16] *See id*. § 27.002 (specifying TCPA's "purpose . . . to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury"); *In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015) (orig. proceeding) (summarizing this purpose as to "identify and summarily dispose of

11

is often characterized as an "anti-SLAPP" law.[17] The Act further directs that it is to be "construed liberally to effectuate its purpose and intent fully."[18] The TCPA pursues any such goals chiefly by defining a suspect class of legal proceedings that are deemed to implicate free expression, making these proceedings subject to threshold testing of potential merit, and compelling rapid dismissal—with mandatory cost-shifting and sanctions—for any found wanting.[19]

---

lawsuits designed only to chill First Amendment rights [but] not . . . dismiss meritorious lawsuits" (citing Tex. Civ. Prac. & Rem. Code § 27.002)).

[17] *See*, *e.g.*, *Elite Auto Body LLC v. Autocraft Bodywerks, Inc.*, ___ S.W.3d ___, No. 3-15-00064-CV, 2017 Tex. App. LEXIS 4108, at *4 n.9 (Tex. App.—Austin May 5, 2017, pet. filed) ("'SLAPP' is an acronym for a 'Strategic Lawsuit Against Public Participation,' which refers, generally speaking, to a meritless lawsuit that is aimed only at deterring free expression through the collateral impacts of the litigation process in itself. The TCPA is said to be an 'anti-SLAPP' law."); *see also Serafine v. Blunt* (*Serafine I*), 466 S.W.3d 352, 365–67 (Tex. App.—Austin 2015, no pet.) (Pemberton, J., concurring) (summarizing TCPA's legislative history and proponents' emphasis on professed "anti-SLAPP" concerns).

[18] Tex. Civ. Prac. & Rem. Code § 27.011(b).

[19] *See id*. §§ 27.003(a), .005(b)–(c), .009(a); *see also id*. § 27.001(2)–(4). As we explained in *Autocraft*:

> Although the TCPA's stated purpose is to serve "the *constitutional* rights of persons to petition, speak freely, associate freely, and otherwise participate in government," the Act does not pursue this ultimate goal directly, aside from [the findings authorized by Section 27.007(a)], which presumably are to inform a court's award of sanctions under the Act. The primary means by which the TCPA advances its purpose is more circuitous—an expedited dismissal mechanism tied to a burden-shifting analysis "through which a litigant may require, by motion, a threshold testing of the merits of legal [actions] that are deemed to implicate the expressive interests protected by the statute."

___ S.W.3d at ___, 2017 Tex. App. LEXIS 4108, at *13–14 (quoting Tex. Civ. Prac. & Rem. Code § 27.002; *Serafine I*, 466 S.W.3d at 369 (Pemberton, J., concurring)); *see also id*. at *14 n.41 (observing that the TCPA in this respect has some similarities to the Medical Liability Act's expert-report requirement (quoting *Serafine I*, 466 S.W.3d at 375 (Pemberton, J., concurring))).

When construing and applying the TCPA, as with other statutes, the Texas Supreme Court has emphasized that we are to look first to the Act's "'plain language,'" and if unambiguous, "'interpret the statute according to its plain meaning.'"[20] "Additionally, '[w]e presume the Legislature included each word in the statute for a purpose and that words not included were purposefully omitted.'"[21]

**"Legal action" subject to TCPA**

The TCPA frames its suspect class of legal proceedings in terms of "legal actions" having certain characteristics. The Act defines "legal action" as "a lawsuit, cause of action, petition, complaint, cross-claim, or counterclaim or any other judicial pleading or filing that requests legal or equitable relief."[22] Having sued appellants seeking monetary and injunctive relief under multiple liability theories, the Abbotts have unquestionably asserted one or more "legal actions" within the TCPA definition.[23] However, in Section 27.010 of the TCPA, the Legislature has exempted certain types of "legal actions" from the Act (and, therefore, from the suspect class potentially subject to

[20] *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 899 (Tex. 2017) (per curiam) (quoting *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015) (per curiam)).

[21] *Id.* (quoting *Lippincott*, 462 S.W.3d at 509).

[22] Tex. Civ. Prac. & Rem. Code § 27.001(6).

[23] *See Autocraft*, ___ S.W.3d at ___, 2017 Tex. App. LEXIS 4108, at *6 ("There is no question that Autocraft's lawsuit seeking injunctive and monetary relief, or alternatively each of its component claims for such relief, is a 'legal action'" (quoting Tex. Civ. Prac. & Rem. Code § 27.001(6))); *see also D Magazine Partners, L.P. v. Rosenthal*, ___ S.W.3d ___, No. 15-0790, 2017 Tex. LEXIS 296*, at *28–29 (Tex. Mar. 17, 2017) (confirming that different "claims" or causes of action can be considered separate "legal actions" for purposes of TCPA).

dismissal), and these include "a legal action seeking recovery for bodily injury."[24]  The Abbotts

persuaded the district court that their assault claim fell within this exemption, and appellants urge

this was error.  Appellants emphasize that the Abbotts had the burden to establish the exemption's

applicability (a proposition that the Abbotts do not appear to dispute[25]) and insist that the Abbotts

failed to do so.  We disagree.

The Abbotts' assault claim is founded on their factual allegations regarding the

altercation between Kristin and the Cavins that took place in late February 2014.  In their live

petition, the Abbotts pleaded, in material part, that:

> Wylie Cavin, who is over six feet tall, physically assaulted Kristin by coming up
> behind her, grabbing her wrists, and forcing her arms behind her.  Wylie Cavin then
> forced Kristin down to the ground on her back, pulled her arms above her head and
> held her writs together with his hands and locked Kristin's body between his knees,
> pinning her to the ground with the weight of his body on top of her.  Wylie Cavin's
> grip on Kristin's wrists caused pain, and her hands turned blue and became numb. As
> Wylie physically assaulted Kristin, he also screamed in her face.  Wylie Cavin's
> physical assault of Kristin caused painful injury to her tailbone and caused her to
> experience ongoing pain requiring physical therapy.  The psychological trauma
> associated with being physically assaulted by her father has continued to cause
> Kristin severe emotional distress to this day.

The Abbotts further pleaded that these alleged acts by Wylie were committed intentionally,

knowingly, or recklessly, and were actionable as the tort of assault of Kristin, "entitl[ing] [her] to

---

[24]  Tex. Civ. Prac. & Rem. Code § 27.010(c).

[25]  *See*, *e.g., Kinney v. BCG Atty. Search, Inc.*, No. 03-12-00579-CV, 2014 Tex. App. LEXIS 3998, at *18 (Tex. App.—Austin Apr. 11, 2014, pet. denied) (mem. op. on reh'g) (recognizing that nonmovant claimant had burden to establish applicability of exemption under TCPA Section 27.010(b) (citing, *inter alia*, *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71, 88–89 (Tex. App.—Houston [1st Dist.] 2013, pet. denied))).

14

damages based on mental anguish, and medical expenses for the injury to Kristin's tailbone and need for continued physical therapy." The Abbotts also specifically prayed for "any medical expenses incurred based on Wylie Cavin's assault."

"Bodily injury" commonly denotes "[p]hysical damage to a person's body."[26] The Abbotts' assault claim seeks recovery for alleged injuries that are plainly of this character—medical expenses for physical damage and compensation for physical pain[27]—and appellants do not suggest that this "legal action" could somehow be subdivided to exclude any additional components of the sought-after damages that would arguably fall outside "bodily injury." Accordingly, the Abbotts' assault claim is exempt from the TCPA as a matter of law.

---

[26] *Black's Law Dictionary* 906 (10th ed. 2014); *see also Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 820–24 (Tex. 1997) (construing standard homeowners' insurance policy—which defined "'bodily injury' as 'bodily harm, sickness or disease'"—as "not includ[ing] purely emotional injuries" and as "unambiguously requir[ing] an injury to the physical structure of the human body"); *id.* at 823–24 ("Our decision comports with the commonly understood meaning of 'bodily,' which implies a physical, and not purely mental, emotional, or spiritual harm." (citations omitted)); *Forbes v. Lanzl*, 9 S.W.3d 895, 900 (Tex. App.— Austin 2000, pet. denied) ("'Bodily injury' means 'physical pain, illness, or any impairment of physical condition.'" (quoting Tex. Pen. Code § 1.07(a)(8))); *id.* ("Bodily injury is a broad term and encompasses even relatively minor physical contacts so long as they constitute more than mere offensive touching." (citing *Lane v. State*, 763 S.W.2d 785, 786 (Tex. Crim. App. 1989))); *The American Heritage Dictionary of the English Language* 204 (5th ed. 2011) (defining "bodily," when used as an adjective, as "[o]f, relating to, or belonging to the body," and as "[p]hysical as opposed to mental or spiritual").

[27] *See Cowan*, 945 S.W.2d at 820–24; *Forbes*, 9 S.W.3d at 900; *Black's Law Dictionary* at 906; *American Heritage* at 204; *see also Kirkstall Rd. Enters. v. Jones*, ___ S.W.3d ___, No. 05-16-00859-CV, 2017 Tex. App. LEXIS 3883, at *5–6 (Tex. App.—Dallas Apr. 27, 2017, no pet. h.) (negligence claims against media defendant for allegedly inducing third parties to shoot him came within "bodily injury" exemption, as it "seeks to recover for the bodily injuries—four gunshot wounds—that he claims he sustained as a result of Kirkstall's negligence in editing and producing the program").

In contending otherwise, appellants attempt to characterize the Abbotts' assault claim as seeking recovery only for "non-physical injuries," further suggesting that the Abbotts' counsel indicated as much during his argument at the hearing. But the Abbotts' live petition—the instrument that sets forth the theories on which they "seek[] recovery"—belies any such characterization. Appellants also maintain that the Abbotts were required, and failed, to present "clear and specific evidence" to substantiate their assault claim. Appellants erroneously conflate the requirements that apply once a "legal action" is shown to be within the suspect class with the issue of whether the Abbotts' "legal action" for assault is subject to these requirements in the first place.[28] The TCPA does not make the "bodily injury" exemption contingent on a threshold showing of merit or "clear and specific evidence."[29] Appellants seek to "read[] language into the statute that is not there,"[30] and we must instead give effect to the words the Legislature has actually included.

Accordingly, the district court did not err in holding that the Abbotts' assault claim is exempt from the TCPA and correspondingly denying appellants' motion as to that claim. We proceed to address appellants' remaining arguments as they implicate the Abbotts' other claims.

---

[28] *Compare* Tex. Civ. Prac. & Rem. Code § 27.005(c) ("The court may not dismiss a legal action under this section if the party bringing the legal action establishes by clear and specific evidence a prima facie case for each essential element of the claim in question."), *with id.* § 27.010(c) ("This chapter does not apply to a legal action seeking recovery for bodily injury . . . .").

[29] *See id.* § 27.010(c).

[30] *Coleman*, 512 S.W.3d at 901.

**Initial burden/applicability**

The TCPA's suspect class encompasses any "legal action" not shown to be exempted from the statute that "is based on, relate[d] to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association."[31] Although the terms "exercise of *the right of free speech*," "exercise of *the right to petition*," and "exercise of *the right of association*" correspond to the familiar constitutional concepts that are the TCPA's ultimate stated concern, the Act supplies a specific definition of each term that does not, save one component of the "exercise of the right to petition" definition, explicitly reference or incorporate the rights of speech, petition, or association as recognized under the First Amendment or its Texas counterpart.[32] In turn, "*is based on, relates to, or is in response to*" serves to capture, at a minimum, a "legal action" that is factually predicated upon alleged conduct that would fall within the TCPA's definitions of "exercise of the right of free

---

[31] Tex. Civ. Prac. & Rem. Code § 27.003(a).

[32] *See Autocraft*, ___ S.W.3d at ___, 2017 Tex. App. LEXIS 4108, at *14–15 & n.43 (observing that "[w]ithin each definition, none explicitly references or purports to incorporate the *constitutional* rights of association, speech, or petition, aside from a single component of the 'exercise of the right to petition' definition" that refers to "'any other communication that falls within the protection of the right to petition government under the Constitution of the United States or the constitution of this state.'" (citing Tex. Civ. Prac. & Rem. Code § 27.001(2)–(5), (7)–(9) and quoting *id.* at § 27.001(4)(E))).

speech," petition, or association.[33] Whether this phrase might extend farther has remained unclear until now—but this is among the issues that appellants' arguments raise, as we will explain below.

A party seeking to invoke the Act's testing and dismissal mechanisms must do so by motion soon after the "legal action" to be challenged is filed.[34] The movant must meet an "initial burden" (also frequently described in terms of demonstrating the TCPA's "applicability"[35]) of "show[ing] by a preponderance of the evidence" that the "legal action" sought to be challenged is within the suspect class, i.e., that it "is based on, relates to, or is in response to" the nonmovant's "exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association," as the TCPA defines those terms.[36] If the movant succeeds, the "legal action" must be dismissed except to the extent "the party bringing the legal action establishes by clear and specific evidence a prima

[33] *See id*. at \*6–7 (observing that initial burden "can be met if . . . Autocraft's claims are predicated factually on conduct that falls within" one of the TCPA-defined categories of protected expression); *Sloat v. Rathbun*, 513 S.W.3d 500, 503 (Tex. App.—Austin 2015, pet. dism'd) ("In applying [the TCPA], Texas courts—including this one—have generally focused solely on the extent to which the factual bases of a challenged 'legal action' constitute expression within the TCPA's definitions of [protected expression]." (citations omitted)). Although the Texas Supreme Court's TCPA precedents have not explicitly adopted this construction of "is based on, relates to, or is in response to," their analyses are consistent with it. *See Hersh v. Tatum*, ___ S.W.3d ___, No. 16-0096*, 2017 Tex. LEXIS 649, at \*10–11 (Tex. June 30, 2017) (discussing role of claimant's petition in determining "the basis of a legal action" and holding Act applicable in light of pleading allegations meeting "exercise of the right of free speech" definition); *Coleman*, 512 S.W.3d at 897, 899–902 (analyzing whether statements complained of in defamation suit were TCPA-protected "exercise of the right of free speech"); *Lippincott*, 462 S.W.3d at 508–10 (analyzing whether statements made the basis of defamation, tortious interference, and conspiracy claims were TCPA-defined "exercise of the right of free speech").

[34] *See* Tex. Civ. Prac. & Rem. Code § 27.003(b).

[35] *See Autocraft*, ___ S.W.3d at ___, 2017 Tex. App. LEXIS 4108, at \*5 (citing *Coleman*, 512 S.W.3d at 897, 899–901).

[36] *See* Tex. Civ. Prac. & Rem. Code § 27.005(b).

facie case for each essential element of the claim in question."[37]  But even if the nonmovant meets this burden and the "legal action" would otherwise survive, the Act still allows the movant to obtain dismissal by "establish[ing] by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim."[38]

The "evidence" the trial court "shall consider" in these inquiries expressly includes "the pleadings and supporting and opposing affidavits stating the facts on which the liability . . . is based," and the Act contemplates primary reliance on such proof.[39]  Consequently, the Abbotts' live petition—including their voluminous attachments reflecting and memorializing appellants' activities—are of central importance to the analysis. "The precise meaning of the phrase 'preponderance of the evidence' within [this] procedural framework remains unclear, as do the standards by which appellate courts are to review these 'preponderance-of-the-evidence' determinations by trial courts."[40]  "We can conclude with certainty, however, that to the extent the

---

[37]  *Id*. § 27.005(c).

[38]  *Id*. § 27.005(d).

[39]  *Id*. § 27.006(a) ("In determining whether a legal action should be dismissed under this chapter, the court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based"); *see Hersh*, ___ S.W.3d at ___, 2017 Tex. LEXIS 649, at *10 ([I]t would be impossible to determine the basis of a legal action, and thus the applicability of the [TCPA], *without* considering the plaintiff's petition. . . . When it is clear from the plaintiff's pleadings that the action is covered by the Act, the defendant need show no more."); *Autocraft*, ___ S.W.3d at ___, 2017 Tex. App. LEXIS 4108, at *6 n.15 (observing, in light of Section 27.006(a), Section 27.006(b)'s proviso allowing for "specified and limited discovery relevant to the motion," and Section 27.007(a)'s requirement for additional "findings" on movant's request regarding underlying intent or motive of "legal action," that "[t]he TCPA contemplates primary reliance, but perhaps not always exclusive reliance, on 'evidence' consisting only of pleadings and affidavits").

[40]  *Autocraft*, ___ S.W.3d at ___, 2017 Tex. App. LEXIS 4108*, at * 6 & nn. 15–16.

19

[TCPA "evidence"] establishes material facts conclusively, our review would be limited to the de novo construction and application of the TCPA's terms."[41]

Appellants urge that they met their initial burden as a matter of law because the pleadings, affidavits, and attachments demonstrate conclusively that each of the Abbotts' claims "is based on, relates to, or is in response to" appellants' "exercise of the right of free speech," in the form of their numerous statements containing the subject matter of the Abbotts' mental health or "abuse." Alternatively, appellants argue that at least some of the Abbotts' claims are "based on, relate[] to, or [are] in response to" appellants' "exercise of the right to petition" through their lawsuits and discovery subpoenas.

### *"Exercise of the right of free speech"*

We will begin by analyzing the validity of appellants' core premise that their numerous statements on the subjects of the Abbotts' purported mental illness or "abuse" qualify as the "exercise of the right of free speech" under the TCPA definition of that term. The TCPA defines "exercise of the right of free speech" as "a communication made in connection with a matter of public concern,"[42] and then defines both "communication" and "matter of public concern." A "communication"—also a component of the Act's "exercise of the right to petition" and "exercise

---

[41] *Id.* at *6 (citing *Sloat*, 513 S.W.3d at 503); *see also Hersh*, ___ S.W.3d at ___, 2017 Tex. LEXIS 649, at *10 (observing that pleadings alone will often be determinative of legal action's basis); *Sloat*, 513 S.W.3d at 503 ("The ultimate question of whether a particular factual basis for a 'legal action' qualifies as expression within the TCPA's definitions is a question of law that we review de novo." (citations omitted)).

[42] Tex. Civ. Prac. & Rem. Code § 27.001(3).

20

of the right of association" definitions[43]—"includes the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic."[44] A "matter of public concern," in turn, "includes an issue related to: (A) health or safety; (B) environmental, economic, or community well-being; (C) the government; (D) a public official or public figure; or (E) a good, product, or service in the marketplace."[45] Thus, reading these definitions together, the "exercise of the right of free speech" for TCPA purposes is a "statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic," "made in connection with" subjects that "include[] an issue related to: (A) health or safety; (B) environmental, economic, or community well-being; (C) the government; (D) a public official or public figure; or (E) a good, product, or service in the marketplace."[46]

In denying appellants' motion, the district court concluded that all of the Abbotts' claims other than for assault (which, again, it correctly held to be exempted from the Act) did not implicate "matters of public concern as a matter of law and [are] thus not covered [by the TCPA]." Appellants insist this was error because the subjects of mental illness or domestic abuse are "issue[s] relating to . . . health or safety." And because their numerous texts, emails, letters, phone calls, oral statements, or other issuances on those subjects were plainly "communications" within the TCPA's broad definition of that term, appellants continue, these "communications" were "made in

---

[43] *See id*. § 27.001(2), (4).

[44] *Id*. § 27.001(1).

[45] *Id*. § 27.001(7).

[46] *Id*. § 27.001(1), (3), (7).

21

connection with a matter of public concern," satisfying the Act's definition of the "exercise of the right of free speech" as a matter of law.

While not appearing to dispute that appellants' statements would qualify as "communications" under the TCPA—and they plainly do—the Abbotts urge that these "communications" should not be considered "matters of public concern." The Abbotts reason that the communications concerned a "private" family dispute and conduct that was actionable as "private torts," characteristics they view as distinguishing the communications from "matters of public concern." In the same vein, the Abbotts point out that in several of the Cavins' writings, the Cavins had attempted to keep their activities under wraps by marking writings "private" or "confidential" and also berating or threatening recipients who dared divulge the content to others. The Abbotts also urge that if the TCPA's "exercise of the right of free speech" definition is construed to cover these particular "private communications," "then private, per se defamation regarding loathsome diseases and **_any_** private, per quod defamation about a person's mental health would always be subject, *de facto*, to the TCPA." The TCPA could not have such "expansive, overreaching scope," the Abbotts insist.

Although the Abbotts' arguments might have greater viability under the more conventional understandings of "matters of public concern" in either constitutional jurisprudence[47]

---

[47] *See*, *e.g.*, *Brady v. Klentzman*, 515 S.W.3d 878, 884 (Tex. 2017) ("According to the [U.S.] Supreme Court, speech 'deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community.'" (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011))); *see also Snyder*, 562 U.S. at 451–52 (emphasizing connection to self-government).

or ordinary usage,[48] it remains that the TCPA has prescribed a specific definition of "matter of public concern" requiring, as applicable to this case, only that "an issue relat[e] to . . . health or safety," without further elaboration or qualification.[49]  And any notion that courts should read implicit limitations into the TCPA definitions derived from broader statutory or jurisprudential context has been put to rest by the Texas Supreme Court's precedents.  In *Lippincott v. Whisenhunt*, the supreme court squarely rejected a court of appeals's view that the TCPA's definitions of the "exercise of the right of free speech" and component terms were impliedly limited, in light of background First Amendment jurisprudence and the TCPA's purposes relating to "public participation in government," solely to speech exercised in a public form of communication.[50]  The supreme court reasoned that "[t]he plain language of the [TCPA] imposes no requirement that the form of the communication be public," and that "[i]n the absence of such limiting language, we must presume that the Legislature broadly included both public and private communication."[51]  The court went on to hold that private emails alleging that a nurse anesthetist "'failed to provide adequate coverage for pediatric cases,' administered a 'different narcotic than was ordered prior to pre-op or patient consent being completed,' falsified a scrub tech record on multiple occasions, and violated [the] company's

---

[48] *See American Heritage* at 1424 (defining "public," when used as an adjective, as "[o]f, concerning, or affecting the community or the people" and as "[m]aintained for or used by the people or community"); *id.* at 381 (defining "concern," when used as a noun, as "[a] matter that relates to or affects one" and as "[r]egard for or interest in someone or something").

[49] Tex. Civ. Prac. & Rem. Code § 27.001(7).

[50] *See Lippincott*, 462 S.W.3d at 509–10; *cf. Whisenhunt v. Lippincott*, 416 S.W.3d 689, 697–700 (Tex. App.—Texarkana 2013), *rev'd*, 462 S.W.3d 507 (Tex. 2015) (per curiam).

[51] *Lippincott*, 462 S.W.3d at 509 (citing Tex. Civ. Prac. & Rem. Code § 27.011).

sterile protocol policy" sufficed as "communication[s] . . . in connection with a matter of public concern" and, therefore, the "exercise of the right of free speech," based on the emails' subject matter alone.[52]

More recently, in *ExxonMobil Pipeline Company v. Coleman*, the Texas Supreme Court confirmed that we must apply a plain-meaning construction of the TCPA definitions' literal language, without regard to the TCPA's broader purposes or background jurisprudence, even when this results in a vastly expansive application of the "exercise of the right of free speech" to reach a business's internal personnel matters having only an indirect relationship to the "matter[s] of public concern" made the basis for the motion. The issue in *Coleman* concerned whether internal communications within a pipeline company regarding an employee's alleged failure to follow a required fuel-tank "gauging" procedure sufficed as the "exercise of the right of free speech," specifically "communication[s] made in connection with" "an issue related to" "health or safety" or "environmental [or] economic . . . well-being."[53] The communications themselves contained no explicit language connecting the "gauging" procedure to one of these "matters of public concern," although the company and employee defendants had presented affidavits (apparently uncontroverted) explaining that the procedure's underlying purposes included preventing fuel spills and attendant

---

[52] *See id*. at 509–10. More specifically, the supreme court relied on a prior holding that "the provision of medical services by a health care professional" was a "matter of public concern" as that concept was being applied in the First Amendment context. *See id*. at 510 (citing *Neely v. Wilson*, 418 S.W.3d 52, 70 nn.12 & 26 (Tex. 2013)). However, the court intimated that the communications would also satisfy the TCPA's "matter of public concern" definition, observing that it "include[s] issues related to health or safety, community well-being, and the provision of services in the marketplace, among other things." *Id*. (citing Tex. Civ. Prac. & Rem. Code § 27.001(7)).

[53] *See Coleman*, 512 S.W.3d at 898–901 (citing Tex. Civ. Prac. & Rem. Code § 27.001(7)).

safety risks, environmental harm, and economic loss.[54] The court of appeals had held the TCPA inapplicable, reasoning that the communications related to a "'private employment matter'"; made "'no mention of health, safety, the environment, or Exxon's economic interests'"; and that the matter was not transformed into a "'public concern'" through its merely "'tangential relationship to health, safety, environmental, and economic concerns.'"[55] The Texas Supreme Court reversed.

Emphasizing its plain-meaning approach in *Lippincott*, the supreme court held that the court of appeals had "improperly narrowed the scope of the TCPA by ignoring the Act's plain language and inserting the requirement that communications involve more than a 'tangential relationship' to matters of public concern."[56] Likewise, the court continued, "[t]he TCPA does not require that the statements specifically 'mention' health, safety, environmental, or economic concerns, nor does it require more than a 'tangential relationship' to the same; rather, TCPA applicability requires only that the defendant's statements are 'in connection with' 'issue[s] related to' health, safety, environmental, economic, and other identified matters of public concern chosen by the Legislature."[57] The supreme court similarly rejected an argument of the claimant that the definition's phrase "communication made *in connection with* a matter of public concern" "'suggest[s] something more than a tenuous or remote relationship'"; in the supreme court's view,

[54] *See id.* at 897–98, 900–01.

[55] *See id.* at 900 (quoting *ExxonMobil Pipeline Co. v. Coleman*, 464 S.W.3d 841, 846 (Tex. App.—Dallas 2015), *rev'd*, 512 S.W.3d 895 (Tex. 2017)).

[56] *Id.* at 900.

[57] *Id.* (citing Tex. Civ. Prac. & Rem. Code § 27.001(3), (7)).

25

this argument amounted to "reading language into the statute that is not there."[58] Applying the definitions as worded, the supreme court held that "[t]he statements, although private and among [the company's] employees, related to a 'matter of public concern' because they concerned Coleman's alleged failure to gauge tank 7840, a process completed, at least in part, to reduce the potential environmental, health, safety, and economic risks associated with noxious and flammable chemicals overfilling and spilling onto the ground."[59]

Among the implications of these Texas Supreme Court precedents, as this Court concluded in *Autocraft*, is that the TCPA's definitions of "exercise of the right of free speech," petition, and association extend considerably beyond—and largely without regard to—the parameters of expression that would actually be protected by the First Amendment or the Texas Constitution.[60] Consequently, we held that an auto-repair business's internal communications incident to alleged misappropriation of trade secrets from a rival sufficed as the "exercise of the right of association" as the TCPA defines that term, regardless of whether those communications were constitutionally protected expression.[61] Whether the expression is constitutionally protected, as we explained, could come into play only in the second phase of the analysis, as a component of a claimant's clear and specific evidence of each essential element of each claim against the defendant.[62] And the same

---

[58] *Id*. at 901.

[59] *Id*. (citing Tex. Civ. Prac. & Rem. Code § 27.001(7)(A), (B); *Lippincott*, 462 S.W.3d at 509).

[60] *See Autocraft*, ___ S.W.3d at ___, 2017 Tex. App. LEXIS 4108, at *11–22.

[61] *See id*. at *22–23.

[62] *See id*. at *21–22.

26

would be true of any other issue going to whether a particular communication is actionable, sanctionable, or (as Wylie put it) "sound[s] crazy," as none of these considerations are incorporated into the TCPA's broad definitions of protected expression,[63] and we are not to "read[] language into the statute that is not there."[64]

Under these precedents, we must reject the Abbotts' invitation to read the TCPA's definitions of "exercise of the right of free speech" and "matter of public concern" more narrowly than the ordinary meaning of their words as written. All the Legislature has required is that appellants' communications be "made in connection with a matter of public concern," and a "matter of public concern" includes "an issue related to . . . health or safety." As appellants urge, the subjects of mental illness or domestic abuse plainly fall within the ordinary meaning of "health" or "safety,"[65] and it is now clear that such "health" and "safety" under the TCPA includes that of private parties embroiled in an otherwise-private dispute far removed from any public participation in

---

[63] *See id*.; *cf infra* at 28–29 (discussing how even frivolous or SLAPP-like lawsuits can satisfy TCPA's "exercise of the right to petition" definition).

[64] *See Coleman*, 512 S.W.3d at 901.

[65] *See Hersh*, ___ S.W.3d at ___, 2017 Tex. LEXIS 649, at *11 ("Clearly, suicide prevention and awareness relate to health, safety, and community well-being, all included in the statutory definition of 'matters of public concern.'" (quoting Tex. Civ. Prac. & Rem. Code § 27.001(7))); *Backes v. Misko*, 486 S.W.3d 7, 17–20 (Tex. App.—Dallas 2015, pet. denied) (holding that subject of whether mother was afflicted with psychological disorder of Munchausen Syndrome by Proxy and was mistreating child as a result "related to health and safety [and] fell within the [TCPA] definition of 'matter of public concern'" (quoting Tex. Civ. Prac. & Rem. Code § 27.001(7))); *see also id*. at 18 (citing dictionary definitions of "'health'" ("'the state of being sound in body or mind'") and "'safety'" ("'the condition of being safe; . . . exemption from hurt, injury, or loss'") (quoting Webster's Third New International Dictionary 1043, 1998 (1981))).

government.[66]  Consequently, appellants' "communication[s] made in connection with" those subjects qualify, as a matter of law, as the "exercise of the right of free speech" under the TCPA definition.

### *"Exercise of the right to petition"*

As for appellants' alternative ground, we similarly conclude that the activities in question—the Cavins' lawsuits against Sandy Whitley and David Hayes and use of discovery subpoenas in those actions—satisfy the TCPA definition of the "exercise of the right to petition." The TCPA defines the "exercise of the right to petition" to include, *inter alia*, "a communication in or pertaining to . . . a judicial proceeding."[67]  As we recognized in the *Serafine* cases, filing a lawsuit and transmitting documents relating to that proceeding—even a lawsuit that itself had characteristics of a true SLAPP, included some bizarre factual allegations, and even gave rise ultimately to sanctions against the claimant—suffices as the "exercise of the right to petition" under the plain-

---

[66]  *Pickens v. Cordia*, on which the Abbotts rely for a contrary view, predates the Texas Supreme Court's decisions in *Lippincott*, *Coleman*, and *Hersh*.  433 S.W.3d 179, 184 (Tex. App.—Dallas 2014, no pet) (reasoning that "[w]hile . . . issues of 'addiction, [and] parental abuse' . . .  may be matters of public concern" in abstract or general sense, holding that family member's blog purporting to recount such problems within his family did not "implicate the broader health and safety concerns or community well-being concerns contemplated by [the TCPA]").

[67]  *See* Tex. Civ. Prac. & Rem. Code § 27.001(4)(A)(i) (defining "exercise of the right to petition" to include "a communication in or pertaining to . . . a judicial proceeding").

meaning construction we are to give the definition's broad language.[68]   Indeed, the Abbotts do not appear to contest that appellants' lawsuits and subpoenas meet this definition.

### Factual predicate

The remaining component of appellants' initial burden is to show that each "legal action" in question "*is based on, relates to, or is in response to*" either appellants' "exercise of the right of free speech" (i.e., their communications on the subjects of mental illness or "abuse") or their "exercise of the right to petition" (their lawsuits and subpoenas).  As indicated, "*is based on, relates to, or is in response to*" serves to capture, at a minimum, a "legal action" that is factually predicated upon alleged conduct that would fall within the TCPA's definition of "exercise of the right of free speech," petition, or association.[69]  From the face of the Abbotts' live petition and attachments, their claims for defamation and tortious interference are "based on, relate[] to, or [are] in response to," in the sense of being factually predicated on, appellants' statements on the subjects of mental illness or "abuse."  Similarly, the Abbotts' abuse-of-process claim is predicated entirely upon the Cavins'

---

[68]   *See Serafine I*, 466 S.W.3d at 376–77 (Pemberton, J., concurring) (noting that "it is arguably the claims asserted by Serafine that more closely resemble the SLAPP paradigm" and that her allegations had included "perceived 'surreptitious video taping' of her and 'several instances of insult, ridicule, and, [Serafine] believes, marshaling of neighborhood gossip against [her],'" "[y]et it is Serafine's claims that are exalted and protected as the 'exercise of the right to petition' under the TCPA, in derogation of the Blunts' rights" (footnote omitted)); *Serafine v. Blunt* (*Serafine II*), No. 03-16-00131-CV, 2017 Tex. App. LEXIS 4606, at *17–19 (Tex. App.—Austin May 19, 2017, no pet. h.) (mem. op.) (affirming sanctions award against Serafine as to her claims against other defendants, as "[t]he record contains ample evidence to support the trial court's findings and conclusions about the groundless claims").

In that regard, the record does not reflect whether Whitley or Hayes filed their own TCPA dismissal motions to contest the Cavins' speech-based "legal actions" against them.

[69]   *See supra* note 33.

29

"exercise of the right to petition," their use of discovery subpoenas. Further, the Abbotts' intentional-infliction-of-emotional-distress (IIED) claim complains in part of the Cavins' lawsuits against Whitley and Hayes, which they view as part of appellants' larger campaign to harass and isolate them from the support of family and friends. To these extents, appellants have met their initial burden as a matter of law.

Urging otherwise, the Abbotts insist that this case is a reprise of *Sloat v. Rathbun*.[70] In that case, Monique Rathbun, whose husband Marty was a former high-ranking member of the Church of Scientology, sued that organization and allied individuals asserting causes of action for intentional infliction of emotional distress, invasion of privacy, intrusion upon seclusion, and tortious interference founded on alleged "constant harassment" having some parallels to the Abbotts' complaints.[71] The defendants filed TCPA dismissal motions, insisting that Rathbun's claims were "'based on, related to, or were in response to' conduct constituting the exercise of their 'right of free speech,' 'right of association,' and 'right to petition.'"[72] However, as we would later explain in our opinion, the defendants did not "address the specific allegations contained in Rathbun's petition and on which she claims to base her causes of action," but "endeavor[ed] to recast her petition" as complaining of more innocuous and peripheral expressive activities, such as holding protest signs

---

[70] *See* 513 S.W.3d 500.

[71] E.g., allegations that the defendants had repeatedly accosted Ms. Rathbun, conducted intrusive surveillance activities against her, published allegations that she was a "sexual pervert" and actually a "man who has had a secret sex-change operation," and had informed "Rathbun's mother, father, former husband, friend, and co-workers . . . that Rathbun's life was at risk as long as she remained married to Marty Rathbun." *Id*. at 505–06.

[72] *Id.* at 502–03 (citing Tex. Civ. Prac. & Rem. Code § 27.001).

30

in the street, "attempting to speak to passers-by or those entering or leaving the property about the impropriety of Marty Rathbun's activities," or filming footage in "public places . . . about issues of potential or public importance, including importance to Scientologists."[73] The district court denied the motion, and the issue on appeal was whether the defendants had met their initial burden, assuming the propositions, not disputed there, that "is based on, relates to, or is in response to" referred to the factual predicates for Rathbun's "legal actions"[74] and that we were to view the pleadings and evidence in the light most favorable to Rathbun when determining what those factual predicates were.[75] In the posture of that appeal, we affirmed the district court' order, concluding that Rathbun's legal actions "are garden-variety tort claims based on specific conduct that the Scientology Defendants have failed to demonstrate, by a preponderance of the evidence, implicates the exercise of their rights of 'free speech,' 'association,' or 'to petition.'"[76]

In addition to emphasizing the factual similarities between appellants' conduct and that alleged of the "Scientology Defendants," the Abbotts read *Sloat* to establish a dichotomy between "garden-variety tort claims" and TCPA-protected conduct, and they insist that their pleadings and evidence demonstrate only the former when viewed in the light "most favorable" to them. The Abbotts misunderstand both *Sloat* and the TCPA. Contrary to their assumption, the TCPA, as previously suggested, is written so as to be implicated by a vast array of "garden-variety

---

[73] *See id*. at 506–07.

[74] *See id*. at 503.

[75] *See id*. at 503–04.

[76] *Id*. at 509.

31

tort claims" that can be said to involve some element of "communication" (as demonstrated in *Coleman*, *Lippincott*, *Autocraft*, and *Serafine*, to name but a few illustrative cases[77]).  *Sloat* did not hold otherwise—its point was instead that the defendants had attempted to demonstrate the TCPA-protected status of activity other than that which was actually the factual basis for Rathbun's causes of action.  In the present case, by contrast, appellants have demonstrated conclusively, in reliance on the Abbotts' pleadings and attachments, that the Abbotts' defamation, tortious-interference, abuse-of-process, and (in part) IIED claims are predicated on appellants' "exercise of the right of free speech" or "exercise of the right to petition" as the TCPA defines those terms.  Nor is the record susceptible to any "favorable" reading that would alter that conclusion.

---

[77] *Coleman*, 512 S.W.3d at 897 (plaintiff employee alleged defamation based on purported misstatements by his supervisors regarding circumstances that led to plaintiff's termination); *Lippincott*, 462 S.W.3d at 508–09 (plaintiff nurse anesthetist brought claims for defamation, tortious interference with existing and prospective business relations, and conspiracy to interfere in business relations, based on "disparaging comments" by surgical facility administrators that plaintiff "represented himself to be a doctor, endangered patients for his own financial gain, and sexually harassed employees"); *Autocraft*, ___ S.W.3d at ___, 2017 Tex. App. LEXIS 4108, at *1–3, *8–10 (plaintiff auto-repair shop alleged theft and misuse of its trade secrets and confidential information, among other claims, based in part on (i) "communications" among defendants and others within competing auto-repair business through which they "shared or utilized" misappropriated information, and on (ii) "communications" by defendants to plaintiff's current employees "to induce them to leave [plaintiff] and come to work for" the competing business); *Serafine I*, 466 S.W.3d at 356–557 & n.1, 359–60 (in suit arising from "neighborhood tussle," counter-claimant's tortious-interference and fraudulent lien counterclaims were, at least in part, "based on, related to, or in response to" plaintiff's filing of suit and filing of lis pendens, both of which were "exercises of [plaintiff's] 'right to petition' as the [TCPA] defines that term" (citing, *inter alia*, Tex. Civ. Prac. & Rem. Code § 27.001(4)(A)(i) ("'Exercise of the right to petition' means . . . a communication in or pertaining to: . . . a judicial proceeding.")).

*"Related to" or "in response to"*

But however expansive the foregoing applications of the TCPA may seem, these holdings do not reach several of the Abbotts' claims that appellants sought to dismiss and that were not exempted as a bodily injury claim. Among these, the Abbotts' IIED claim, although predicated partly on appellants' "exercise of the right to petition" through their lawsuits, also complains of additional "communications" by the Cavins "made in connection with" subjects that could not reasonably be considered "issue[s] related to . . . health or safety," such as Wylie's "dog's butt" slur and the insinuations that Bill married Kristin for her money. While it is conceivable that some of these additional "communications" might independently qualify as the "exercise of the right of free speech" through a different prong of the Act's generous "matter of public concern" definition,[78] or as the "exercise of" one of the other two categories of TCPA-protected activity,[79] appellants did not preserve any such alternative ground for dismissing this portion of the IIED claim.[80] Similarly, the Abbotts' claims for invasion of privacy, conversion, and (in additional part) IIED are founded factually on alleged physical intrusions upon personal or property interests that could not be considered "communications," a prerequisite to all three of the TCPA-defined categories of protected

---

[78] *Cf. Serafine I*, 466 S.W.3d at 378 (Pemberton, J., concurring) (suggesting that wife's expressed concern about husband's judicial salary would seem to fall within ordinary meaning of an "issue related to . . . economic . . . well-being").

[79] *See id*. (similarly suggesting that TCPA "exercise of the right of association" arguably would also reach that same husband-wife conversation, as it occurred within the context of a family relationship).

[80] *See, e.g., Long Canyon Phase II & III Homeowners Ass'n v. Cashion*, 517 S.W.3d 212, 219 & n. 23 (Tex. App.—Austin 2017, no pet.) (recognizing that TCPA movant is confined on appeal to grounds and theories raised in its motion); *Serafine I*, 466 S.W.3d at 359–60 (same).

activity, as previously explained.[81]  (For ease of reference, we will term these claims not predicated factually upon appellants' TCPA-protected activity as their "additional claims").

Had appellants argued only that the Abbotts' "legal action[s]" were "based on, relate[d] to, or [were] in response to"—in the sense of being predicated upon factually—the "exercise of the right of free speech" or the "exercise of the right to petition" appellants had claimed in their motion, we would proceed to affirm the district court's denial of appellants' motion as to the Abbotts' additional claims, as we have done in prior cases having analogous postures.[82]  But in each of those cases, the movant has either presumed that "is based on, relates to, or is in response to" refers solely to the factual predicate for a "legal action" or it has otherwise been unnecessary for us to consider whether the term extends any farther.[83]  This case differs in both respects.

---

[81]  The same could be said of the Abbotts' assault claim, if not already exempted from the Act.

[82]  *See Autocraft*, ___ S.W.3d at ___, 2017 Tex. App. LEXIS 4108, at *8–9 (affirming order denying TCPA dismissal motion as to complained-of conduct "that in itself would not necessarily entail 'the making or submitting of a statement or document in any form or medium'" and thus would not be a "'communication'"); *Long Canyon*, 517 S.W.3d at 219 & n. 23 (affirming denial of TCPA dismissal motion as to factual bases for claims that were not challenged in the motion); *Serafine I*, 466 S.W.3d at 359–60 (same); *Combined Law Enforcement Ass'ns of Texas v. Sheffield*, No. 03-13-00105-CV, 2014 Tex. App. LEXIS 1098, at *2, *13–16, *35 (Tex. App.—Austin Jan. 31, 2014, pet. denied) (mem. op.) (looking to whether "communications . . . that Sheffield [the plaintiff and nonmovant] alleges to be defamatory fall within the TCPA's definition of the exercise of the right of association" and affirming denial of motion to dismiss with respect to communications that movants failed to show were within such definition).

[83]  *See Autocraft*, ___ S.W.3d at ___, 2017 Tex. App. LEXIS 4108, at *6–7 (noting that this was the sense in which "is based on, relates to, or is in response to" was argued on appeal); *Sloat*, 513 S.W.3d at 503 (observing that (i) "Texas courts . . . have generally focused solely on the extent to which the factual bases of a challenged 'legal action' constitute expression within the TCPA's definitions" and (ii) "[n]either party has presented any reason to depart from this prevailing view, so we will continue to apply it here" (citing *Sheffield*, 2014 Tex. App. LEXIS 1098, at *13–16; *Serafine I*, 466 S.W.3d at 373 (Pemberton, J., concurring))); *Serafine I*, 466 S.W.3d at 374–75

Appellants can meet their initial burden as to the Abbotts' additional claims only to the extent any of these claims "is based on, relates to, or is in response to" appellants' "exercise of the right of free speech" or "exercise of the right to petition" in some sense other than factual predicate. And appellants have preserved arguments that the phrase does incorporate meanings that extend beyond factual predicate. Among these, appellants suggest that the additional claims (and, indeed, the Abbotts' entire lawsuit) are "related to" appellants' "exercise of the right of free speech" or "exercise of the right to petition" in the sense of being rooted in a common controversy, or as having overlapping facts and evidence, regarding the Cavins' opposition to Kristin and Bill's relationship. As illustration, they emphasize portions of the Abbotts' response in which the Abbotts cite as evidence for their additional claims various of the writings that we have held to be either the "exercise of the right of free speech" or "exercise of the right to petition." Appellants similarly urge that the Abbotts' entire lawsuit "is in response to" appellants' "exercise of the right of free speech" or "exercise of the right to petition" in the sense of reacting to or temporally following. In this regard, appellants observe that while the additional claims would have accrued in early to mid-2014, the Abbotts did not send their demand letter until April 2015, in reaction to Wylie's March 2015 letter to the PUC, and did not file their suit until after the Cavins had filed their suits against Whitley

_____

(observing that parties had assumed this meaning of "is based on, relates to, or is in response to"); *see also Hersh*, ___ S.W.3d at ___, 2017 Tex. LEXIS 649, at *10–11 ("based on" component was decisive); *Coleman*, 512 S.W.3d at 897, 899–902 (holding that statements complained of in defamation suit were TCPA-protected "exercise of the right of free speech"); *Lippincott*, 462 S.W.3d at 508–10 (holding that statements made the basis of defamation, tortious interference, and conspiracy claims were TCPA-defined "exercise of the right of free speech").

and Hayes, served the subpoenas, and continued to persist in posting videos and making other

communications about the Abbotts' mental health and supposed "abuse."[84]

The questions appellants now raise regarding the scope of "is based on, relates to, or

is in response to" were foretold by the *Serafine* concurrence.[85] Applying a plain-meaning

---

[84] In their dismissal motion, appellants also went farther to assert that these circumstances demonstrate the Abbotts' suit was subjectively motivated to punish or retaliate against them for their "exercise of the right of free speech" or "exercise of the right to petition," further suggesting that the additional claims were a "ginned up" pretext. However, we do not understand appellants to be urging this view of "is based on, relates to, or is in response to" on appeal, and we thus express no opinion as to whether the standard incorporates that meaning or how courts are to determine or review such determinations of motive and intent made within the TCPA's procedural framework. *But cf. Serafine I*, 466 S.W.3d at 392 (Pemberton, J., concurring) (suggesting that "relates to" or "is in response to" language might "capture any 'legal actions' that have the subjective goal of chilling speech").

[85] As was observed there, the phrase "is based on, relates to, or is in response to" is a composite of three components that are presented as disjunctive alternatives—(1) "is based on"; (2) "relates to"; "or" (3) "in response to"—and "we would normally presume that these alternatives were not intended to be redundancies of one another, but that each would have some distinct meaning and effect." *Id.* at 390–91 (Pemberton, J., concurring) (citing *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011)). The ordinary meaning of the "is based on" component, as the concurrence recognized, denotes a legal action that has the relevant TCPA-protected activity "as a 'main ingredient' or 'fundamental part,'" which "corresponds to the prevailing construction that Texas courts have been giving to the phrase 'is based on, relates to, or is in response to' as a whole, focusing on the factual bases underlying a 'legal action.'" *Id.* at 391 (citing *Webster's Third New Int'l Dictionary* 180 (2002) (defining "base" (n.) as "main ingredient" and "fundamental part of something"); *American Heritage* at 148 (defining "base" (n.) as "fundamental principle," "underlying concept," "fundamental ingredient," and "chief constituent"); *see also Black's Law Dictionary* at 180 (defining "base" (v.) as "to use (something) as the thing from which something else is developed")). Then the concurrence posited the same question that appellants' arguments raise here: "What, then, is the role of the two remaining components of the standard, 'relates to' and 'in response to'?" *Id.*

At least if courts applied the ordinary meaning of "relates to" and "in response to," the concurrence concluded, those terms would extend the TCPA "considerably farther beyond even the prevailing Texas construction." *Id.* at 391–92. "The ordinary meaning of 'relates to,'" it noted, would merely "denote some sort of connection, reference, or relationship." *Id.* at 391 (citing *Webster's* at 1916 (defining "relate" as "to be in relationship: to have reference")); *American*

36

construction of "relates to" and "in response to," and without needing to comprehensively determine

the terms' outer boundaries, the Abbotts' additional claims would "relate to" appellants' "exercise

of the right of free speech" or "exercise of the right to petition," as there is some sort of connection,

reference, or relationship between them. Under the Abbotts' theory of the case, for example, all of

appellants' complained-of acts are portrayed as components of an overarching campaign of

harassment and attempted isolation aimed first at disrupting their marital plans, then at retribution

after those efforts failed. The additional claims would also be "in response to" appellants' "exercise

of the right of free speech" or "exercise of the right to petition" in the sense that they reacted to or

were asserted subsequently to appellants' ongoing communications regarding mental health or

"abuse" and their lawsuits and subpoenas.

The Texas Supreme Court's analysis in *Coleman* forecloses any possibility that we

should view "relates to" or "in response to" as limited according to, e.g., the nature, directness, or

strength of such connections. Addressing the analogous relational term "in connection with" under

---

*Heritage* at 1482 (defining "relate" as "to have connection, relation, or reference")). On the other
hand, "'in response to,' would denote some sort of answer or other act in return." *Id*. (citing
*Webster's* at 1935 (defining "response" as "act or action of saying something in return, making an
answer"); *American Heritage* at 1496 (defining "response" as "an answer")). And as applied to the
circumstances of that case, which involved an "'exercise of the right to petition' in the form of a
lawsuit" and a "legal action" in the form of a counterclaim to it, the concurrence observed:

> The ordinary meaning of a "legal action" that "relates to" the "exercise of the right
> to petition" in the form of a lawsuit would encompass, among other claims, those
> arising from the same "transaction or occurrence" as the lawsuit, like compulsory
> counterclaims. The ordinary meaning of "[i]n response to" would sweep more
> broadly still, seemingly including *any* counterclaim or other competing or defensive
> claim that another party subsequently asserts.

*Id*. at 391–92.

37

the "exercise of the right of free speech definition," the supreme court reasoned that construing the phrase to exclude indirect, "tenuous," or "remote" relationships in the absence of explicit statutory language to that effect amounted to "reading language into the statute that is not there."[86] The Legislature has required only that a "legal action" "relates to" TCPA-protected activity or "is in response to" such activity, with no qualification as to either, and *Coleman* has further instructed us to give effect to the ordinary meaning of those unqualified terms. On this record, the Abbotts' additional claims fall well within these parameters.

Before reaching a final conclusion on this issue, however, we should acknowledge that there continues to exist, at least in theory, a limiting principle holding that plain-meaning statutory construction does not control where it would yield an "absurd result" that the Legislature could not possibly have intended.[87] There is an understandable inclination to deem this principle implicated where, as here, the plain-meaning construction of a statute that ostensibly seeks to vindicate cherished constitutional rights of free expression (and, some say, combat "SLAPP" litigation) has the effect of protecting such divergent alleged misconduct as auto theft and stalking, and in the context of a family fracas having little to do with public participation in government. One might similarly observe that under the foregoing plain-meaning construction of the TCPA, it is hard to conceive of a "legal action" that is *not* "based on, relate[d] to, or . . . in response to" at least one of the TCPA's three defined categories of protected activity, so long as the complained-of conduct

---

[86] *Coleman*, 512 S.W.3d at 901.

[87] *See*, *e.g.*, *Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 46 (Tex. 2015) ("[W]e initially limit our statutory review to the plain meaning of the text as the sole expression of legislative intent, unless the Legislature has supplied a different meaning by definition, a different meaning is apparent from the context, or applying the plain meaning would lead to absurd results." (citations omitted)).

had some kernel of TCPA-defined "communication" within it.[88] Perhaps it is these implications that truly "sound crazy," to borrow Wylie's phrase.

But, as the Texas Supreme Court has instructed us, "[t]he absurdity safety valve is reserved for truly exceptional cases, and mere oddity does not equal absurdity."[89] We ultimately cannot say that the foregoing plain-meaning construction of the TCPA rises to the "truly exceptional" "absurdity" level. The Act, as previously explained, seeks to "safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government" against infringement by meritless lawsuits by defining a suspect class of "legal actions" that are deemed to implicate free expression and making these subject to the remedies the Act provides. The issues we have been exploring regarding the Act's definitions of protected expression and the "is based on, relates to, or is in response to" connector go to the breadth of that suspect class. It is conceivable that the Legislature would see fit to cast this net exceptionally widely—opting for a hand grenade rather than a rifle shot—perhaps in recognition of a high value being ascribed to constitutionally-protected expression that may be subsumed somewhere within the Act's definitions of protected expression, or in an effort to capture expression-targeting "legal

---

[88] For years, some of us have cautioned about such implications of the TCPA's plain meaning as written. *See*, *e.g.*, *Serafine I*, 466 S.W.3d at 377–95 (Pemberton, J., concurring) (urging that these implications point toward narrower reading informed by constitutional context); *Neyland v. Thompson*, No. 03-13-00643-CV, 2015 Tex. App. LEXIS 3337, at *42 (Tex. App.—Austin Apr. 7, 2015, no pet.) (mem. op.) (Field, J., concurring) ("It seems that any skilled litigator could figure out a way to file a motion to dismiss under the TCPA in nearly every case, in the hope that the case will not only be dismissed, but that the movant will also be awarded attorneys' fees."); *see also Serafine I*, 466 S.W.3d at 357 n.1 (acknowledging these "valid concerns over the breadth of the Texas Citizens Participation Act").

[89] *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 630 (Tex. 2013); *see id.* (explaining that "the bar for reworking the words our Legislature passed into law is high, and should be").

actions" that might otherwise be creatively pleaded so as to avoid the statute's requirements. That such crafting of a statute might have practical consequences far afield from its subjectively intended purposes, or from what has been said to be a statute's intended purposes, is nothing new. We are bound to give effect to the statute the Legislature has written.

\* \* \*

The district court correctly concluded that the Abbotts' assault claim is exempted from the Act. However, contrary to the district court's conclusions, appellants met their initial burden as to each of the Abbotts' other claims.

**Merits-testing issues**

The claims still at issue can survive dismissal, and the district court's order can be affirmed, only to the extent the Abbotts established, "by clear and specific evidence[,] a prima facie case for each essential element of [each] claim in question."[90] Further, regardless of whether the Abbotts met this burden, a claim must be dismissed to the extent appellants have "establishe[d] by a preponderance of the evidence each essential element of a valid defense to [that] claim."[91] Although the district court did not reach these additional inquiries, they were before the court when it ruled on appellants' motion,[92] and no additional trial-level proceedings are necessary for the issues

---

[90] Tex. Civ. Prac. &. Rem. Code § 27.005(c).

[91] *Id*. § 27.005(d).

[92] *See id*. § 27.005(b)–(d).

40

to be judicially determined.[93]  Accordingly, we proceed to "render the [order] that the trial court should have rendered."[94]

We need only address the Abbotts' burden.  The Abbotts' burden can be restated in terms of three components:  (1) with respect to "each essential element of [each] claim in question," they must have presented (2) a "prima facie case" (3) "by clear and specific evidence."[95]  "Essential element" is used in the conventional sense to denote the facts that a party must plead and prove in order to obtain relief on a claim.[96]  Similarly, "prima facie case" has been held to incorporate that phrase's "traditional legal meaning"—"evidence sufficient as a matter of law to establish a given fact if not rebutted or contradicted,"[97] also described as "the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.'"[98]  The requirement of "clear and specific evidence," in turn, serves to limit the range of evidence that counts toward a prima-facie case solely to that which is "unambiguous," "sure," or "free from doubt'" (the ordinary meaning of "clear") and "explicit" or "relating . . . to a particular named thing" (the ordinary meaning of

---

[93]  *See id*; *Serafine I*, 466 S.W.3d at 357 ("We . . . review de novo a trial court's determination of whether a [TCPA] nonmovant has presented clear and specific evidence establishing a prima facie case for each essential element of the challenged claims.").

[94]  *See* Tex. R. App. P. 43.3; *see also id*. R. 44.1(a) (harmless-error rule).

[95]  *See* Tex. Civ. Prac. &. Rem. Code § 27.005(c).

[96]  *See Lipsky*, 460 S.W.3d at 592–96 (discussing, with respect to TCPA non-movant's burden, essential elements of business-disparagement and defamation claims).

[97]  *Id*. at 590 (citing *Simonds v. Stanolind Oil & Gas Co.*, 136 S.W.2d 207, 209 (Tex. 1940)).

[98]  *Id*. (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (per curiam)).

41

"specific").[99]  Collectively, these elements require that a party "provide enough detail to show the factual basis for its claim,"[100] and thus effectively abrogate the utility of mere notice pleading as "evidence" to that end.[101]

In this case, the TCPA "evidence" presented by the Abbotts includes, as previously noted, the numerous documents that they attached and incorporated into their petition,[102] effectively comprising a petition of over 200 pages in length.  These documents are potentially a fertile source of "clear and specific" evidence to meet the Abbotts' burden—indeed, one cannot fathom evidence of an allegedly actionable written communication that could be more "clear and specific" than a copy of the communication itself.  However, in neither the district court nor on appeal have the Abbotts undertaken to link particular facts reflected in the documents to each of the essential elements for which they must present a prima-facie case with respect to each claim.  Instead, the Abbotts have merely recited what they view as the essential elements of each claim; cited en masse to pages of the record they deem relevant to *some* unspecified element or elements of that claim; but provided no argument, analysis, or explanation as to which record reference supports which elements or (perhaps

---

[99]  *Black's Law Dictionary* at 307, 1616; *Lipsky*, 460 S.W.3d at 590 (approving these definitions of "clear" and "specific"); *accord Serafine*, 466 S.W.3d at 358.

[100]  *Lipsky*, 460 S.W.3d at 591.

[101]  *See id*. at 590–91.

[102]  *See* Tex. Civ. Prac. & Rem. Code § 27.006(a); *Fawcett v. Grosu*, 498 S.W.3d 650, 660 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) ("Based on section 27.006(a)'s directive ('the court shall consider the pleading[s] and supporting and opposing affidavits . . . .') and the Texas Supreme Court's interpretation that 'pleadings and evidence' setting forth the factual basis for a claim are sufficient to resist a TCPA motion to dismiss, Grosu [the non-movant] was permitted to rely on his pleadings (including exhibits) in response to appellants' motion to dismiss." (citing *Lipsky*, 460 S.W.3d at 591)).

more critically) why that evidence would satisfy the specific element under the governing law. This is akin to the summary-judgment non-movant who, while having the burden, merely points to a voluminous record, assures the court that a fact issue is in there somewhere, and leaves it to the court to figure out why or how—a practice long deemed insufficient to defeat summary judgment.[103] And although the documentary evidence we have previously summarized would likely satisfy *some* elements of *some* claims (e.g., the defamatory nature of appellants' statements accusing Bill of predatorily exercising mind control over Kristin[104]), we cannot similarly conclude that *each* element of that or any other claim would necessarily be satisfied.

Without more, we cannot conclude that the Abbotts have met their burden to "establish[] by clear and specific evidence a prima facie case for each essential element of [each] claim in question."[105] Consequently, the TCPA requires that these claims be dismissed.[106]

---

[103] *See, e.g., Pressley v. Casar*, No. 03-15-00368-CV, No. 03-15-00505-CV, 2016 Tex. App. LEXIS 13651, at *17–18 (Tex. App.—Austin Dec. 23, 2016, pet. filed) (mem. op.) ("In the absence of any guidance from the non-movant where the evidence can be found, the trial [and appellate courts are] not required to sift through voluminous [evidence] in search of evidence to support the non-movant's argument that a fact issue exists." (quoting *Nguyen v. Allstate Ins. Co.*, 404 S.W.3d 770, 776 (Tex. App.—Dallas 2013, pet. denied) (quoting *Aguilar v. Morales*, 162 S.W.3d 825, 838 (Tex. App.—El Paso 2005, pet. denied)))).

[104] *See Backes*, 486 S.W.3d at 26–27 (accusation that mother was afflicted with psychological disorder of Munchausen Syndrome by Proxy and resultantly abusing child was held to be defamatory); *see also Lipsky*, 460 S.W.3d at 596 ("Accusing someone of a crime, of having a foul or loathsome disease, or of engaging in serious sexual misconduct are examples of defamation per se.").

[105] Tex. Civ. Prac. & Rem. Code § 27.005(c); *see also* Tex. R. App. P. 33.1(a), 38.1(i).

[106] Tex. Civ. Prac. & Rem. Code § 27.005(b), (c).

**CONCLUSION**

The foregoing holdings require that we affirm the district court's order denying appellants' TCPA dismissal motion only with respect to the Abbotts' assault claim.  As to each of the Abbotts' other claims, we must reverse the district court's order and render judgment dismissing the claims.  We remand the case to the district court to determine the attorney's fees and sanctions that must be awarded incident to such dismissal under the TCPA,[107] as well as for reconsideration, in light of our opinion, of the discretionary attorney's fees previously imposed by that court against appellants.[108]  We emphasize that our holdings address only the specific claims now before us.

_____
Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Field

Affirmed in part; Reversed and Rendered in part; Reversed and Remanded in part

Filed:   July 14, 2017

---

[107] *See id*. § 27.009(a); *Serafine II*, 2017 Tex. App. LEXIS 4606, at \*19–24 (explaining the TCPA's attorney's-fee and sanction provisions).

[108] *See* Tex. Civ. Prac. & Rem. Code § 27.009(b).