# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00301-CV

_____


JOHN KAWCAK, Appellant

V.

ANTERO RESOURCES CORPORATION, Appellee

---

On Appeal from the 236th District Court
Tarrant County, Texas
Trial Court No. 236-298822-18

---

Before Gabriel, Pittman, and Bassel, JJ.
Opinion by Justice Bassel

**OPINION**

## I. Introduction

This is an interlocutory appeal from the denial of a motion to dismiss relying on the Texas Citizens Participation Act (TCPA or Act). Appellant John Kawcak candidly acknowledges how broadly he interprets the right of association found in the Act. He largely concedes that Appellee Antero Resources Corporation accurately characterizes his position as being that "the TCPA would apply in any case [in which the] plaintiff alleged that the defendant conducted illegal acts through a conspiracy [in] which the co-conspirators 'associated' with and communicated with each other." Adopting this interpretation turns what many believe is a scalpel used to explore whether a lawsuit suppresses the exercise of constitutional rights into a maul that can be wielded against almost any conspiracy claim, theft-of-trade-secrets claim, or tortious-interference claim when that claim involves more than one actor producing the interference.

No one can doubt the power of the TCPA to rock a claimant back on its heels. Once in the grip of the TCPA, a party may stairstep down increasingly dire consequences that most litigants do not face:

—All discovery is suspended until the trial court rules on the TCPA motion to dismiss (unless the trial court allows specified and limited discovery);

> —in an abbreviated time frame, the party bringing the claim must establish a prima facie case for each of its essential elements with clear and specific evidence;

2

—the parties may file an interlocutory appeal to test the trial court's ruling on the TCPA motion to dismiss; and

—a final result that may be an order of the trial or appellate court that dismisses the action, bringing the consequences of not only paying the party's fees to pursue the action, defend against the TCPA motion, and defend or prosecute an appeal but also a mandatory just and equitable award of the court costs, reasonable attorney's fees, and expenses incurred by the party's opponent and an award of sanctions.

We cannot agree with Kawcak's position that the TCPA is so all-encompassing a protection that any party making a conspiracy claim must face the potential of these consequences—though his position is not without support either in the language of the Act or the cases examining that language. The Act, in our view, contains a check on the interpretation that Kawcak advocates: its plain language. Namely, the Act defines "the right of association" as requiring the expression, promotion, pursuit, or defense of "common interests." Tex. Civ. Prac. & Rem. Code Ann. § 27.001(2). In a matter of first impression, we interpret the word "common" to have a plain meaning that implicates more than the narrow selfish interests of persons who act jointly to commit a tort. Because Kawcak concedes that his interest is shared only by himself and his alleged co-conspirator, we conclude that the TCPA does not apply to this lawsuit and affirm the trial court's denial of the motion to dismiss.

## II. Factual and Procedural Background

Plaintiff's First Amended Petition was the live pleading when Kawcak filed his TCPA motion to dismiss.

3

The amended petition, in a section titled "Need for Action," gives the following overview of the suit:

> Antero [Resources Corporation] seeks to recover damages from former rogue employee John Kawcak. Kawcak was Antero's top operational employee and [was] intimately involved in a bribery/kickback scheme with Tommy Robertson and his affiliated companies. Kawcak was Antero's top operational employee during the relevant time period and was responsible for hiring vendors and supervising and monitoring Antero's expenditure of hundreds of millions of dollars for operations in West Virginia. The kickback scheme gave the Tommy Robertson companies a monopoly over Antero's operations and allowed them to avoid any negative consequences due to their demonstrably deficient work.

The factual allegations of the petition claim that Kawcak held the title of Operations Superintendent for Antero in West Virginia. Kawcak's job duties in that role included selecting which vendor to use in operations, determining the amount to pay the vendor, and supervising overall operations in the "utmost fidelity" to the interests of Antero. Allegedly, Antero executed an internal policy that prohibited Kawcak from taking gifts from a "supplier" of more than a nominal value and prohibited the disclosure of confidential information.

Kawcak allegedly hired companies affiliated with an individual named Tommy Robertson to perform services on Antero's operations. According to the amended petition, Tommy Robertson had a monopoly over Antero's West Virginia operations, and the services performed by Robertson or his companies were substandard. During the period that Kawcak hired and retained the Tommy Robertson companies to

4

provide services, Kawcak allegedly received the free use of an airplane from Robertson and several hundred thousand dollars in payments.

The petition further states:

Tommy Robertson and the Tommy Robertson companies [allegedly] made those improper payments in exchange for [Kawcak's] choosing the Tommy Robertson companies to provide goods and services over the goods and services of other vendors; the goods and services of other vendors were higher quality, more cost efficient, and more available when compared to the Tommy Robertson companies.

This allegedly created a situation in which "it took the Tommy Robertson companies roughly twice as long to perform the job, which roughly doubled the costs to Antero because most of the goods and services are billed on a per/day basis." Kawcak allegedly favored the Tommy Robertson companies by never allowing "a meaningful bidding process" to take place in the hiring of vendors.

Antero also claims that Kawcak allegedly shared confidential pricing information with Robertson. This information was not provided to other vendors, and the Tommy Robertson companies' possession of the information was "a key component of the Tommy Robertson companies' scheme." The scheme allegedly operated so that

[t]he Tommy Robertson companies were able to adjust their prices to ensure that Kawcak had plausible deniability for hiring them despite their substandard work. Reducing the prices did not hurt the Tommy Robertson companies because they still were able to extract huge profits by taking much longer to accomplish a job[—]such as frac plug drillouts[—]than other available vendors. Because the Tommy Robertson companies charged by the day for most goods and services,

5

the longer they took resulted in Antero paying unnecessary daily rentals. Such sharing provides no benefit to Antero.

The amended petition lists a number of duties that Kawcak owed to Antero, including acting only in the best interest of Antero, exercising good faith and uncorrupted business judgment, avoiding self-dealing, avoiding the use of his position for personal gain, refusing gifts that violated Antero's conduct code, and acting with integrity. Kawcak allegedly breached his duties

> by knowingly approving incorrect and/or inflated invoices, disclosing Antero's confidential pricing information to Tommy Robertson, refusing to exercise oversight over the Tommy Robertson companies, and ensuring that Antero used the Tommy Robertson companies instead of far more qualified, proficient[,] and cost-efficient vendors that were available. Antero would not have made any payments to the Tommy Robertson companies had Kawcak not breached the fiduciary duties he owed to Antero.

Kawcak and Robertson and his companies allegedly concealed "their scheme" from Antero and never disclosed the payments that Robertson and his companies made to Kawcak.

Based on the factual allegations, Antero asserted claims against Kawcak for (1) breach of fiduciary duty, (2) money had and received, (3) declaratory judgment, (4) attorney's fees, and (5) exemplary and punitive damages.

Shortly after the filing of the amended petition, Kawcak filed his motion to dismiss under the TCPA. Both sides filed evidence on the issues raised by the TCPA motion. The filings of the parties and the evidence attached to the filings consume hundreds of pages in the clerk's record. That evidence, however, did not broaden the

6

basic issues outlined in the amended petition or give the suit a different character than that which Kawcak acknowledges it has—a conspiracy exists between Kawcak and Robertson or his companies to profit each. The evidence focused on whether Antero's allegations were sustainable or, in Kawcak's view, were baseless and contrary to common sense. After a hearing, the trial court denied Kawcak's TCPA motion.

The issues Kawcak raises on appeal retain the same focus as those raised in the trial court. As we noted at the outset of this opinion, Kawcak accepts Antero's basic characterization of the nature of the suit—"[Kawcak] conducted illegal acts through a conspiracy [in] which the co-conspirators 'associated' with and communicated with each other." Other than argument about the core question of whether the TCPA applies to this suit as the parties characterize it, the eight appellate issues raised by Kawcak involve discovery disputes, the ability of the trial court to accept evidence after hearing a TCPA motion, and whether (assuming the TCPA applies) Antero carried its burden to bring forward prima facie evidence of the elements of its claims.

### III. Standard of Review

Here, because we construe the language of the TCPA, we apply a de novo standard of review. *See ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 899 (Tex. 2017) (*ExxonMobil II*); *see also Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 897 (Tex. 2018) ("In TCPA appeals, we have decided whether communications are matters of public concern under a de novo standard of review, suggesting that the determination is one of law.").

7

## IV. The Background and the Structure of the TCPA

The TCPA is popularly known as the Texas Anti-SLAPP statute, referring to Strategic Lawsuits Against Public Participation. Other courts have thoroughly dissected the legislature's incentive to enact legislation that addresses the "pernicious" effect of "the harm intended by the baseless litigation [that suppresses] the sorts of expressive activities that are the essence of self-government." *Serafine v. Blunt*, 466 S.W.3d 352, 366 (Tex. App.—Austin 2015, no pet.) (op. on reh'g) (Pemberton, J., concurring).

These courts have done an equally thorough job of highlighting that the legislature did not import the traditional remedies associated with SLAPP suits or even use that term in the TCPA. *Id.* at 367. Instead,

> [t]he specific means by which the [*l*]egislature sought to accomplish the TCPA's stated purposes was to provide a new set of procedural mechanisms through which a litigant may require, by motion, a threshold testing of the merits of legal proceedings or filings that are deemed to implicate the expressive interests protected by the statute, with the remedies of expedited dismissal, cost-shifting, and sanctions for any found wanting.

*Id.* at 369.

This court recently described the zig-zagging burdens of proof found in the TCPA's procedural mechanisms:

> Once a motion to dismiss is filed, a burden-shifting mechanism goes into effect. [*In re Lipsky*, 460 S.W.3d 579, 586–87 (Tex. 2015) (orig. proceeding).] First, a defendant moving for dismissal has the burden to show by a preponderance of the evidence that the plaintiff filed a "legal action" that is "based on, relates to, or is in response to" the defendant's

exercise of the right of free speech, the right to petition, or the right of association. Tex. Civ. Prac. & Rem. Code Ann. §§ 27.003(a), .005(b); *Youngkin v. Hines*, 546 S.W.3d 675, 679 (Tex. 2018).

Second, if the defendant satisfies that burden, to avoid dismissal, a plaintiff must establish by clear and specific evidence a prima facie case for each essential element of its claim. Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c). The requirement for "clear and specific evidence" means the plaintiff "must provide enough detail to show the factual basis for its claim." *Lipsky*, 460 S.W.3d at 590–91.

Third, even if the plaintiff establishes a prima facie case, the defendant can still obtain dismissal if he "establishes by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim." Tex. Civ. Prac. & Rem. Code Ann. § 27.005(d).[1]

*Beving v. Beadles*, 563 S.W.3d 399, 404 (Tex. App.—Fort Worth Oct. 18, 2018, pet. filed).

The TCPA also sets deadlines for the filing of the motion to dismiss, the hearing on the motion to dismiss, and the time in which the trial court must rule. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 27.003(b), .004, 005(a). As alluded to in the introduction, the filing of the motion suspends discovery (unless the trial court, upon a showing of good cause, orders specified and limited discovery). *Id.* §§ 27.003(c), .006(b). The trial court makes its ruling by considering "the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." *Id.* § 27.006(a).

---

[1]The original text was set forth in a single paragraph. We have broken the text into three paragraphs to make it easier to see each point when the burden shifts.

9

An accelerated interlocutory appeal is permitted "from a trial court order on a motion to dismiss" or a trial court's failure to rule within the time specified to make a ruling (and the failure to rule within that period is considered a denial of the motion). *Id.* § 27.008. Finally, "the court shall award the moving party" both fees and sanctions "[i]f the court orders dismissal of the legal action." *Id.* § 27.009(a). The trial court shall award costs and fees to the responding party if it "finds that a motion to dismiss . . . is frivolous or solely intended to delay." *Id.* § 27.009(b). Sanctions shall also be imposed. *Id.* § 27.009(a)(2).

## V. A Summary of How We Decide This Appeal

As noted in the introduction, our resolution of this appeal turns on the plain meaning of the word "common." As best we can tell, we are the first court to focus on what the word means in the definition of the right of association found in the TCPA. This focus may seem trivial, but it establishes a point where two roads of TCPA interpretation diverge. One road assigns a meaning to the word "common" that embraces a set of only two people and triggers the TCPA in almost any case of conspiracy. The other road reads "common" to embrace a larger set defined by the public or at least a group. In our view, a plain-meaning interpretation of the TCPA supports the second definition. Though it is not the result that drives our analysis, the choice of a definition tied to the public or a group does return the TCPA to the mission that most believed it had at its passage.

10

Our analysis is straightforward but admittedly long. To preview what lies ahead, we bullet point the flow of our decision as follows:

• The communication implicating the right of association as defined in the TCPA is broad but requires those relying on the right to have exercised the right in furtherance of "common interests."

• To determine what the word "common" means, we must determine its plain meaning, and the supreme court has cautioned that we must be especially careful to adhere to a plain-meaning analysis when interpreting the TCPA.

• Determining a word's plain meaning is a dictionary-driven process; the primary definition of "common" in *Webster's* relates to a community at large, and the secondary definition defines "common" to be an interest shared by only two people.

• The definitions of "common" in *Cambridge*, *MacMillan*, and *Oxford* have the same ordering as *Webster's* but use less precise language.

• The definition of "common" in *American Heritage*, however, inverts the definition, with the primary definition being the interest shared by two people.

   o When faced with a word that has multiple definitions, we must select the definition that is most consistent with the statutory scheme.

   o We select the definition of "common" that relates to a group or community for the following reasons:

      ☐ It carries out the stated purposes of the TCPA and prevents the right of association from being an outlier in the statutory scheme;

      ☐ The definition we apply fits the context of the other words used in the TCPA definition of "the right of association" and prevents the TCPA from being used to protect rights detached from or even at odds with the TCPA; and

      ☐ The definition we apply carries out the Act's manifest object and avoids an absurd construction, irrationally favoring certain parties with TCPA protection.

11

- Opinions of other courts of appeals that may conflict with the outcome of this appeal overread the stricture of the supreme court precedent and have not examined the question we resolve.

- Opinions of other courts of appeals that align with our holding do so without articulating the rationale we offer.

## VI. Analysis

### A. The TCPA's Definition of the "Right of Association"

Here, Kawcak relies only on the right of association to argue for the application of the TCPA. Thus, we focus on the Act's definition of the "right of association" and the initial burden of whether Kawcak has established by a preponderance of the evidence that Antero has filed a legal action based on, relating to, or in response to that right.

This task requires us to first synthesize the Act's linguistic structure. The structure is an inverted funnel with a broad triggering provision that grows even broader by integrating the definitions.

- The trigger of the Act provides that a party may file a motion to dismiss "[i]f a legal action is based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association." *Id.* § 27.003(a).

- Each of the rights enumerated in the triggering provision has a specific definition, but each of those definitions incorporates the word "communication." *Id.* § 27.001(2), (3), (4). That word has its own unique TCPA definition: "the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." *Id.* § 27.001(1).

12

- Finally, the right involved in this case—the right of association—is defined as "a communication between individuals who join together to collectively express, promote, pursue, or defend common interests." *Id.* § 27.001(2).

Pulling these definitions through the triggering provision permits the filing of a TCPA motion to dismiss based on the right of association, "[i]f a legal action is based on, relates to, or is in response to" "the making or submitting of a statement or document in any form or medium" "between individuals who join together to collectively express, promote, pursue, or defend common interests." We cannot fail to acknowledge that this language gives the right of association a broad sweep.

## B. Interpreting the Words of the TCPA by Analyzing their Plain Meaning

The breadth of the language of the TCPA—such as that set forth above defining "the right of association"—has presented challenges (and temptations) to the courts of appeals. But the Texas Supreme Court has made it clear that no special rules of interpretation apply to rein in the Act out of concern that its words over-remedy the evil it addresses. The overarching principle of interpretation with the TCPA (or any statute) commands that we go no further to understand the Act than the plain meaning of the words it uses:

> "Our objective in construing a statute is to give effect to the [*l*]egislature's intent, which requires us to first look to the statute's plain language." If the statute's language is unambiguous, "we interpret the statute according to its plain meaning." Additionally, "[w]e presume [that] the [*l*]egislature included each word in the statute for a purpose and that words not included were purposefully omitted."

13

*ExxonMobil II*, 512 S.W.3d at 899 (citations omitted). In all cases, but especially with recent focus on those interpreting the TCPA, "[a] court may not judicially amend a statute by adding words that are not contained in the language of the statute. Instead, it must apply the statute as written." *Id.* at 900 (quoting *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 508 (Tex. 2015)).

Specifically, when dealing with the TCPA, the supreme court warns against "improperly narrow[ing] the scope of the TCPA by ignoring the Act's plain language and inserting . . . requirement[s]" not found in that language. *Id.*; *see also Adams*, 547 S.W.3d at 894 ("We must construe the TCPA according to its text. The statute assigns detailed definitions to many of the terms it employs, and we must adhere to statutory definitions." (citations omitted)). In other words, courts must interpret the Act with awareness of the dissonance created by the fact that the TCPA's express purpose is to protect constitutional rights, yet the definitions of the rights set out in the TCPA are not drafted to mimic the boundaries of constitutional rights established by the First Amendment. *Adams*, 547 S.W.3d at 892 ("The TCPA provides its own definition of 'exercise of the right of free speech.' The statutory definition is not fully coextensive with the constitutional free-speech right protected by the First Amendment to the U.S. Constitution and article I, section 8 of the Texas [c]onstitution.").

14

Exacerbating our challenge is the TCPA's directive that it "shall be construed liberally to effectuate its purpose and intent fully." *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.011.

Thus, we begin our analysis thoroughly cautioned by the supreme court to adhere to the Act's plain language and to not import limitations on that language that may exist in the constitutional right of association but which are not found in the TCPA's statutory definition. We can abide by the instruction to follow the meaning of the words used to define "the right of association" while still not giving it the breadth of application advocated by Kawcak.[2]

## C. Applying a Dictionary-Driven Definition of the Word "Common" Used in the Definition of "the Right of Association"

Our focus is on the meaning of the word "common" that is used in defining the common interests that individuals join together to collectively express, promote, pursue, or defend when exercising a TCPA-defined right of association. We disagree with Kawcak on the set of individuals that defines "common interests." He presumes "common" is an interest that is shared by only two individuals to further an interest

---

[2]We are resolving this case at the first step of the TCPA process, i.e., whether the TCPA applies to Antero's suit. As noted above, that step is usually resolved based on a preponderance of the evidence. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b) (stating that "a court shall dismiss a legal action against the moving party if the moving party shows by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of: . . . (3) the right of association"). This step is simplified for us because Kawcak acknowledges the character of his suit, and this allows us simply to answer the question of whether that characterization fits within the terms of the TCPA.

15

limited to their own selfish concerns.  We conclude that set needs a broader application, requiring interests common to the public or a group.

The first principle used to analyze the meaning of words in a statute is that "[w]ords not statutorily defined bear their common, ordinary meaning unless a more precise definition is apparent from the statutory context or the plain meaning yields an absurd result." *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018). Then, "[t]o determine a term's common, ordinary meaning, we typically look first to dictionary definitions." *Id.*  And, again, we must be especially careful to follow this "dictionary-driven" analysis when interpreting the language of the TCPA.  *Elite Auto Body LLC v. Autocraft Bodywerks, Inc.*, 520 S.W.3d 191, 204 (Tex. App.—Austin 2017, pet. dism'd) (stating that the supreme court's "analysis makes clear that this [c]ourt is to adhere to a plain-meaning, dictionary-definition analysis of the text within the TCPA's definitions of protected expression, not the broader resort to constitutional context that some of us have urged previously").

*Webster's* definition of "common" supports a plain meaning of the word that embraces interests broader than the narrow interest shared by two people who engage in a conspiracy where one conspirator allegedly breaches his fiduciary duty to profit himself and his co-conspirator.  The ordering of the definitions found in *Webster's* bears out this conclusion:

> 1a:  of or relating to a community at large <as a family unit, social group, tribe, political organization, or alliance>:  generally shared or participated in by individuals of a community:  not limited to one person or special

16

group <we the people of the U.S., in order to . . . provide for the ~ defense—*U.S. Constitution*> <a sense of common interest, a guild feeling in reaction against the extreme competitive individualism—J. M. Barzun>
b:  known to the community; *esp*:  notorious as an accustomed general vexation <a ~ thief> <punished as a ~ scold> <maintaining a ~ nuisance>
c:  belonging to or typical of all mankind; shared by all men <our ~ humanity> <our ~ nature>

2a:  held, enjoyed, experienced, or participated in equally by a number of individuals:  possessed or manifested by more than one individual <a ~ attribute> <a ~ characteristic>:  calling forth, giving rise to as source, or sending out a number of different items:  marked by the same relationship to a number of persons or things <our ~ rights> <the sharp teeth ~ to all cats> <streets radiating out from a ~ center> <we will help our allies against our ~ enemy>
b:  marked by or resulting from joint action of two or more parties:  practiced or engaged in by two or more equally <in the partnership of our ~ enterprise we must share in a unified plan—F.D. Roosevelt> <our ~ defense> <by ~ consent the partnership was dissolved>[.]

*Webster's Third New Int'l Dictionary* 458 (2002).

Relying on the primary definition of "common," we conclude that the common interests required in the TCPA's definition of "the right of association" must be shared by the public or at least a group.  We are not required to determine what group crosses the boundary of common.  Here, we need only decide that the interests of two conspirators who join together to commit a tort do not cross the threshold of common and thus do not bring the conspirators within the protections of the TCPA.

Three other dictionaries have the same ordering of the definition as *Webster's*. Those dictionaries have less precise language than that found in *Webster's*, but each of

17

them makes the broader definition of "common" the primary definition and makes

the definition that limits the word to a set of only two or more the second choice.[3]

### D. Other Definitions of the Word "Common" and Our Ability to Select a Definition that Fits Within the Context of the TCPA

One dictionary defines the word "common" by inverting the definition found

in *Webster's*. *See The American Heritage College Dictionary* 281 (3d ed. 1993) ("1.a.

Belonging equally to or shared equally by two or more; joint. [1.]b. Of or relating to

the community as a whole; public."). This definition literally supports Kawcak's

premise that the set embraced by the word "common" in section 27.001(2) need be

no more than two individuals. But a plain meaning of "common" that might literally

embrace Kawcak's position does not end the journey. When faced with an often-

---

[3]The *Cambridge* dictionary defines "common" as follows: "[1.] found frequently in many places or among many people: *Money worries are a common problem for people raising children.* [2.] belonging to or shared by two or more people or things: *Guilt and forgiveness are themes common to all of her works.*" *See Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/common (last visited Feb. 13, 2019).

The *MacMillan* dictionary defines "common" as follows: "1. happening frequently, or existing in large amounts or numbers. 2. used, done, or shared by two or more people." *See MacMillan Dictionary*, https://www.macmillandictionary.com/us/ dictionary/american/common_1 (last visited Feb. 13, 2019).

The *Oxford* dictionary defines "common" as follows: "1. Occurring, found, or done often; prevalent. 2. Shared by, coming from, or done by more than one." *See Oxford Dictionary*, https://en.oxforddictionaries.com/definition/us/common (last visited Feb. 13, 2019).

encountered word that has multiple definitions, we apply the definition most in harmony with the word's use in its statutory context.

The multiple dictionaries that support our decision to adopt the broader definition of "common" are sufficient to support our holding. That said, we appreciate both that we are the first court to dissect the definition of the word "common" and that our holding arguably conflicts with how other courts have applied the TCPA's definition of "the right of association." To be thorough, we will also address why the definition we apply fits within the context of the TCPA.

"[I]f an undefined term has multiple common meanings, it is not necessarily ambiguous; rather, we will apply the definition most consistent with the context of the statutory scheme." *Thompson v. Tex. Dep't Licensing & Regulation*, 455 S.W.3d 569, 571 (Tex. 2014). This is a principle of long standing and one relied on recently and repeatedly by the supreme court. *See City of Richardson v. Oncor Elec. Delivery Co.*, 539 S.W.3d 252, 261 (Tex. 2018) (defining "street" and "alley" and noting that "when an undefined statutory term has multiple common meanings, it is not necessarily ambiguous; rather, we will apply the definition most consistent with the context of the statutory scheme") (internal quotations omitted); *Sw. Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 405 (Tex. 2016) (defining "processing" and noting that "the meaning must be in harmony and consistent with other statutory terms and [i]f a different, more limited, or precise definition is apparent from the term's use in the context of the statute, we apply that meaning" and that "[i]f an undefined term has multiple common meanings,

19

it is not necessarily ambiguous; rather, we will apply the definition most consistent with the context of the statutory scheme") (internal quotations omitted); *Greater Houston P'ship v. Paxton*, 468 S.W.3d 51, 58 (Tex. 2015) (defining "governmental body" and noting that "[u]ndefined terms in a statute are typically given their ordinary meaning, but if a different or more precise definition is apparent from the term's use in the context of the statute, we apply that meaning" and that "we will not give an undefined term a meaning that is out of harmony or inconsistent with other terms in the statute"); *State v. $1,760.00 in U.S. Currency*, 406 S.W.3d 177, 180 (Tex. 2013) (defining "novelties").[4]

---

[4]*$1,760.00* delved deeply into the authority requiring that a word with multiple definitions be given a meaning in harmony within its statutory context:

> However, we will not give an undefined term a meaning that is out of harmony or inconsistent with other terms in the statute. *In re Hall*, 286 S.W.3d 925, 929 (Tex. 2009) [(orig. proceeding)]; *see also Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 750–51 n.29 (Tex. 2006) (applying the traditional canon of construction *noscitur a sociis*—or "it is known by its associates"—to construe the last term within a series). "[I]f a different, more limited, or precise definition is apparent from the term's use in the context of the statute, we apply that meaning." *Hall*, 286 S.W.3d at 929. Therefore, when an undefined term has multiple common meanings, the definition most consistent within the context of the statute's scheme applies. *See id.* (applying the dictionary's second definition of "detention" as the term is used in the [Texas] Juvenile Justice Code); *see also* [*TGS–NOPEC Geophysical Co. v.*] *Combs*, 340 S.W.3d [432,] 441 [(Tex. 2011)] ("It is a fundamental principle of statutory construction and indeed of language itself that words' meanings cannot be determined in isolation but must be drawn from the context in which they are used.").

406 S.W.3d at 180–81.

And the context we use to select the appropriate definition of "common" is the statutory scheme as a whole. *See Fort Worth Transp. Auth.*, 547 S.W.3d at 838 ("When interpreting each provision, we must consider the statutory scheme as a whole." (citing *20801, Inc. v. Parker*, 249 S.W.3d 392, 396 (Tex. 2008), and *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001))). Our final goal in this exercise is one of harmony, taking "the context and framework of the entire statute and meld[ing] its words into a cohesive reflection of legislative intent." *Id.* at 839 (quoting *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 326 (Tex. 2017)).

**1. The definition of the word "common" that we apply fits within the context and the statutory scheme of the TCPA.**

When freed to examine the use of the word "common" in the statutory context and the stated purpose of the TCPA, we are fully convinced that it must mean an interest shared by more than two persons.

Before we integrate the stated purpose of the TCPA into our analysis, we first clarify how we are using it. We are not letting the tail wag the dog by using the stated purpose to alter the clear language of a statute. That we cannot do and are not doing. Even if reading the plain language to contain purposes not expressed in its clear language "would be the best policy choice for furthering the statute's stated purpose, we must 'read unambiguous statutes as they are written, not as they make the most policy sense' because 'policy arguments cannot prevail over the words of the statute.'"

21

*Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 67 (Tex. 2014) (Boyd, J., dissenting) (citation omitted) (quoting *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 629 (Tex. 2013), and *In re Allen*, 366 S.W.3d 696, 708 (Tex. 2012) (orig. proceeding)).

But by looking to a statutory purpose to aid us in deciding which of two available definitions we should choose, we are simply acknowledging that a dog has a tail. Ignoring a statute's stated purpose willfully and needlessly blinds us from the insight of a legitimate aid in making this choice:

> Some courts and commentators have said that the prologue [or stated purpose] cannot be invoked when the text is clear. The limitation is reasonable if it means that the prologue cannot give words and phrases of the dispositive text itself a meaning that they cannot bear. *But the limitation is unreasonable and erroneous if it means that the prologue cannot be considered in determining which of various permissible meanings the dispositive text bears.* If the prologue is indeed an appropriate guide to meaning, it ought to be considered along with the other factors in determining [whether] the instrument is clear. The factors undermining its reliability affect its weight, not its relevance.

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 218 (2012) (emphasis added) (footnote omitted); *see also Tex. Health Presbyterian Hosp. of Denton v. D.A.*, No. 17-0256, 2018 WL 6713207, at *4–5 (Tex. Dec. 21, 2018) (referencing *Reading Law* in its grammatical analysis of section 74.153 of the Texas Medical Liability Act and citing cases in which other courts have relied on *Reading Law* in similar grammatical analyses).

As noted, the legislature stated the purpose of the Act, and that purpose gives context that undermines a conclusion that the word "common" embraces the narrow

22

interests of two conspiring tortfeasors.  The stated purpose is "to *encourage and safeguard the constitutional rights of persons* to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, *protect the rights of a person to file meritorious lawsuits for demonstrable injury*."  Tex. Civ. Prac. & Rem. Code Ann. § 27.002 (emphasis added).  At the outset of this opinion and as explained below, a definition of "common" that is limited to the interests of two tortfeasors does not encourage and safeguard any constitutional right and undermines the right of persons to file meritorious lawsuits for demonstrable injury.

Also, the definition of "common" that we apply brings the right of association into harmony with the other rights defined by the Act.  The other exercises of rights defined in the TCPA have some public component (though they may not be coextensive with First Amendment constitutional rights), and this makes it incongruous to conclude that the word "common" does not embrace at least some public or at least group component.  For example, the "exercise of the right to free speech" requires a "communication made in connection with a matter of public concern."  *Id.* § 27.001(3).  The "exercise of the right to petition" requires a communication that pertains to governmental or at a minimum, public proceedings. *Id.* § 27.001(4)(A)–(E).

To give the word "common" a definition that embraces the actions of only two tortfeasors would make the right of association an outlier in this TCPA scheme.  The right of association would apply in a way completely divorced from any exercise of

23

public participation or from a relationship even tangentially related to the purpose of the TCPA. This conclusion does not rely on giving the Act's words a constitutional gloss but on a common principle of interpretation.

The words in the definition of the "exercise of the right of association" in the TCPA also express concepts that implicate acts of association that more resemble those protected by the constitutional right rather than the association existing between co-conspirators in the context of the allegations of this suit.

- The definition of the "exercise of the right of association" uses the word "express." *Id.* § 27.001(2) ("'Exercise of the right of association' means a communication between individuals who join together to collectively express, promote, pursue, or defend common interests."). Though we would be on weak footing to rely exclusively on this fact, one line of cases involving the right of association defines that right as one of "expressive association" that is designed to protect a broader range of interests than simply those of two tortfeasors.[5]

---

[5]In *Ex parte Flores*, 483 S.W.3d 632, 641–42 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd), the Fourteenth Court of Appeals noted the difference between intimate and expressive association and noted the characteristics of the latter:

Another line of cases involves "a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." [*Roberts v. United States Jaycees*, 468 U.S. 609,] 618, 104 S. Ct. 3244[, 3249 (1984).] "[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Id.* at 622, 104 S. Ct. [at 3252] (citing cases). This right of "expressive association" does not provide generalized protection for "social association," however. *City of Dallas v. Stanglin*, 490 U.S. 19, 25, 109 S. Ct. 1591, [1595] (1989).

- The definition also requires "individuals" to "join together" to act "collectively" to "express, promote, or defend common interests."

  o The definition does not state these interests to be "their" common interests, which would point to common interests held only by the individuals themselves. *See Combs*, 340 S.W.3d at 439 ("We presume that the [l]egislature chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen."). The words included and omitted from the statute reinforce our view that the word "common" requires the activities of a group rather than the selfish interests of two persons acting to conspire to commit a breach of fiduciary duty. Indeed, this is a concept drawn from the cases dealing with how the right of association is exercised—not as two forwarding their selfish interests but as a group to forward a set of interests held by the group.[6]

---

[6]Commentators on the right of association emphasize how the right functions to serve group and not individual interests:

But the relationship of beliefs to the association serves an alternative explanatory function. This inquiry concerns the function of the nominal group, and disqualifies groups whose activity consists only of individual pursuit of beliefs or goals by way of the group but not through it; groups in which, instead, realization of the beliefs and goals is solely the product of individual action.

There is clear evidence of this group-function view in several cases, especially in Justice O'Connor's concurring opinion in the *Roberts* case. [468 U.S. at 639, 104 S. Ct. at 3261 (O'Connor, J., concurring)]. . . .

. . . .

The distinction lies in the definitional nature of an association under the First Amendment, not in the value of a group's common beliefs. Amway representatives, like shareholders in a corporation, may believe in the company at many levels, and their investment may advance the company's goals—but their association with the company is atomistic, not collective. Like the Jaycees, as Justice O'Connor described them, shareholders may be like-minded, but they act as individuals pursuing their own beliefs, not those of others. Their

o Second, to adopt Kawcak's view renders "common" surplusage, which can be formulated as follows: "the making or submitting of a statement or document in any form or medium" "between individuals who join together to collectively express, promote, pursue, or defend [common] interests." Because we seek to give effect to the words that the legislature chose to include in the statute, we likewise decline to interpret this section in such a way that requires us to treat "common" as surplusage. *See Cont'l Cas. Ins. Co. v. Functional Restoration Assocs.*, 19 S.W.3d 393, 402 (Tex. 2000) ("[W]e give effect to all words of a statute, and, if possible, do not treat any statutory language as mere surplusage.").

- Finally, in a case that we will discuss below, another justice notes that there is "no constitutional right to engage in criminal behavior, commit civil wrongs, or otherwise inflict injury upon others." *Cheniere Energy, Inc. v. Lotfi*, 449 S.W.3d 210, 217–20 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (op. on reh'g) (Jennings, J., concurring). This reinforces our conclusion that the purpose of the TCPA is to protect constitutional rights, while at the same time protecting "the rights of persons to file meritorious lawsuits for demonstrable injury," and may inform our decision as to which definition of "common" best fits the context of the Act.

Our analysis targets the words defining "the right of association." It does not rely solely on a conclusion that giving the words of the definition the breadth Kawcak sees in them must violate a plain meaning because it so clearly exceeds the stated purposes of the TCPA. However, in cases similar to ours, others have not shown any reluctance to reach that conclusion. *See Universal Plant Servs., Inc. v. Dresser-Rand Grp., Inc.*, No. 01-17-00555-CV, 2018 WL 6695813, at *17 (Tex. App.—Houston [1st Dist.]

---

decisions to invest or sell are not instances of collective action by the group.

Randall P. Bezanson, Sheila A. Bentzen & C. Michael Judd, *Mapping the Forms of Expressive Association*, 40 Pepp. L. Rev. 23, 33–34 (2012) (footnotes omitted).

Dec. 20, 2018, no pet.) (Keyes, J. concurring). The concurrence in *Universal Plant* dealt with a petition that "involve[d] conspiring or colluding to misappropriate or convert trade secrets and other protected information without any identified act of speech or association on the part of [the parties] that can be given a non-tortious interpretation" and asked whether a petition with these limited allegations even arguably could warrant the filing of a TCPA motion to dismiss. *Id.* at *20.

Justice Keyes answered the question "no" because the plain meaning of "the right of association"—albeit without any analysis of the term "common"—had to be informed by the stated purposes of the TCPA. In her view, a plain meaning of the right of association (or the TCPA in general) that did not take into account the plain meaning of the purposes of the TCPA left the job of interpreting the act half-finished because

> [t]o read out of the TCPA the requirement that movants must prove that the activities in which they are engaged and for which they were sued are at least arguably lawful constitutionally protected activities contradicts the statute's purpose and its plain language. It also undermines the second stated purpose of the Act, namely, to protect the rights of parties . . . to bring claims [that are] meritorious on their face without having to suffer vexatious delays based on the TCPA and the burden of proving a prima facie case regardless of a showing by the TCPA movants that the respondent's suit against them was in retaliation for their exercise of lawful protected rights of speech, petition, or assembly.

*Id.* She found nothing in the supreme court's opinions in *Lippencott* and *Coleman* contrary to her views. *See id.* at *16–19. We understand and share Justice Keyes's disbelief that an act with the targeted purpose of the TCPA has blossomed into a

27

protection for parties accused of tortious acts that have no arguable constitutional protection. That said, the limit we place on the scope of the right of association does not require a broad melding of the purposes and definitions of the TCPA but results primarily from the words of the definition itself.

To conclude our explanation of the plain meaning of the definition of the word "common," let us reiterate what we are not saying; we are not saying that the right of association defined by the TCPA precisely mimics (nor is required to mimic) a constitutional right of association. But we are saying that a host of factors—the purposes of the Act, the context created by the definitions of the other rights, and the unique words of the definition read with a background of the structure of the constitutional right of association—are guideposts that signal which of the varied definitions of a word with so broad a meaning as "common" we should select. Although we do not precisely define its limits, it is a definition that is broader than the interests of two conspiring tortfeasors.

## 2. Our definition of "common" avoids an absurd construction of the TCPA that defeats the stated purposes of the TCPA.

We ground our holding on the plain meaning of the words in the TCPA and the principles that allow us to select a definition of "common" that adheres to a plain-meaning construction. But that grounding does not prevent us from noting and agreeing with our sister courts that highlight the absurdity and incongruity of giving the TCPA's right of association the breadth advocated by Kawcak. Admittedly, these

28

opinions are not buttressed by our plain-meaning analysis and instead go straight to the conclusion that the broad reading advocated by Kawcak is absurd. That does not mean that the opinions of our sister courts are without effect in a plain-meaning analysis. One aspect of that analysis is that courts should choose between competing constructions of a word based on which construction carries out rather than defeats the statute's object.

Specifically, "when . . . 'the language is susceptible [to] two constructions, one of which will carry out and the other defeat [its] manifest object, [the statute] should receive the former construction.'" *Hebner v. Reddy*, 498 S.W.3d 37, 41 (Tex. 2016) (quoting *Citizens Bank of Bryan v. First State Bank*, 580 S.W.2d 344, 348 (Tex. 1979), which was cited in *Reading Law*). We have repeatedly highlighted the twin purposes of the TCPA: (1) to "encourage and safeguard" constitutional rights and (2) to "protect the rights of a person to file meritorious lawsuits for demonstrable injury." *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.002. A definition of "common" that focuses on the public or group implements both purposes while one that focuses on any interest shared between two people serves neither.

The most succinct explanation of this concept is found in the Dallas Court of Appeals's opinion in *ExxonMobil Pipeline Co. v. Coleman*, 464 S.W.3d 841, 846–49 (Tex. App.—Dallas 2015) (*ExxonMobil I*), *rev'd*, 512 S.W.3d 895 (Tex. 2017). The Dallas court did not parse the language of the statute but went straight to the heart of why the right of association must embrace more than the shared interest of two persons:

29

> Here, if we were to look only to the text of section 27.001(2), defining the right of association as a communication between individuals who join together to collectively express, promote, pursue, or defend common interests, it would result in giving constitutional right of association protection to virtually any private communication between two people about a shared interest. That is an absurd result that does not promote the purpose of the Act. Chapter 27 is intended to curb strategic lawsuits against public participation.

*Id.* at 847. The Texas Supreme Court reversed the Dallas court's *ExxonMobil I* opinion but only on its holding applying the TCPA's definition of the right to free speech; the supreme court specifically noted that it expressed "no opinion on whether the challenged communications were made in the exercise of the right of association under the TCPA." *ExxonMobil II*, 512 S.W.3d at 902.

The Dallas court in *ExxonMobil I* agreed with the criticisms of an unbounded reading of the right of association expressed by the concurrence of Justice Jennings in our sister court in Houston's *Cheniere Energy*. *ExxonMobil I*, 464 S.W.3d at 848–49. That concurrence noted that the words used in the "awkward" definition of the right of association "do[] appear to include communications that are not constitutionally protected and do not concern citizen or public participation." *Cheniere Energy*, 449 S.W.3d at 219. Justice Jennings went on to articulate a criticism of an expansive reading that we share—to give the right of association the breadth advocated by Kawcak would require a reading that makes the statute a sword to protect the commission of civil wrongs and that ignores the stated purpose of the statute to protect the right to file meritorious lawsuits:

> Although citizens most certainly do have a First Amendment right to associate to bring about social and political change for our "common interests," there is no constitutional right to engage in criminal behavior, commit civil wrongs, or otherwise inflict injury upon others. Importantly, the legislature expressly included within the stated purpose of the TCPA its intent to, "at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury."

*Id.* (quoting Tex. Civ. Prac. & Rem. Code Ann. § 27.002).

Justice Jennings also explained why reading the right of association so expansively would not serve the TCPA's stated purpose of protecting the right to file a meritorious lawsuit but instead would "actually thwart any meritorious lawsuit for demonstrable injury in which a plaintiff alleges that two or more persons engaged in a civil wrong involving a communication." *Id.* With that claim, "[t]he defendants could, at the very least, add unnecessary delay and expense to a plaintiff's lawsuit, no matter how meritorious, by simply asserting that, in committing their complained-of acts, they were exercising their right of association by engaging in a communication 'to collectively express, promote, pursue, or defend' their own private, 'common interests.'" *Id.* at 219–20; *see also Universal Plant*, 2018 WL 6695813, at \*20 (stating that an overly broad reading of the TCPA causes parties "to suffer vexatious delays based on the TCPA and the burden of proving a prima facie case regardless of a showing by the TCPA movants that the respondent's suit against them was in retaliation for their exercise of lawful protected rights of speech, petition, or assembly").

The El Paso Court of Appeals has suggested that "[a]s the statute is literally written, the common purpose for the association might be something improper, such

31

as that alleged here—to injure Appellees in retribution for some past vendetta." *MVS Int'l Corp. v. Int'l Advert. Solutions, LLC*, 545 S.W.3d 180, 194 (Tex. App.—El Paso 2017, no pet.). None of *MVS*'s holdings focus on this concern, but the opinion highlighted an anomaly created by applying the right of association based on a distinction hinging on whether a single tortfeasor or multiple tortfeasors acted:

> Participants to a criminal conspiracy could require a plaintiff suing them to make a clear and specific showing of a prima facie case in as few as sixty days[] and[,] failing that, obtain a dismissal with prejudice. Conversely, a single defendant, accused of much less culpable conduct, might have to engage in years of discovery before seeking vindication.

*Id.* (citation omitted).

We have no need to anticipate the criticisms directed at labeling an application of the TCPA absurd because those criticisms have already been written. The first is the one we have addressed—we have the tail wagging the dog: if the plain language of the statute supports Kawcak's construction, then courts cannot restrict that construction by superimposing a purpose, intent, or requirement not reflected in the plain meaning of that language. *See ExxonMobil II*, 512 S.W.3d at 900–01. Again, we base our holding on a plain-meaning analysis of the words used in the definition of "the right of association." We have stated as well why our holding violates neither the supreme court's directive to apply a plain meaning to the TCPA nor the holdings applying that directive.

A second criticism attacks the conclusion that an expansive reading of the right of association—such as that advocated by Kawcak—is absurd. Though not

32

specifically dealing with the right of association, this criticism begins with the premise that "mere oddity does not equal absurdity." *Cavin v. Abbott*, 545 S.W.3d 47, 70 (Tex. App.—Austin 2017, no pet.).[7] In *Cavin*'s view, the striking breadth of the TCPA arguably accomplishes the legislature's purpose:

> It is conceivable that the [l]egislature would see fit to cast this net exceptionally widely—opting for a hand grenade rather than a rifle shot—perhaps in recognition of a high value being ascribed to constitutionally-protected expression that may be subsumed somewhere within the Act's definitions of protected expression, or in an effort to capture expression-targeting "legal actions" that might otherwise be creatively pleaded so as to avoid the statute's requirements. That such crafting of a statute might have practical consequences far afield from its subjectively intended purposes, or from what has been said to be a statute's intended purposes, is nothing new.

*Id.* at 71.

In our view, this argument proves too much and does not convince us that we have selected too narrow a definition of "common." The argument elevates the TCPA's stated purpose of protecting constitutional rights and subordinates the TCPA's other stated purpose to preserve the filing of meritorious lawsuits. That skew does not accomplish the legislature's directive that the TCPA "shall be construed liberally to effectuate its purpose and intent fully." *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.011(b). The long-established processes found in the rules of civil procedure

---

[7]We agree that oddity is not the equivalent of absurdity. *See Jaster v. Comet II Constr.*, 438 S.W.3d 556, 569 (Tex. 2014) ("The 'bar for reworking the words our [l]egislature passed into law is high, and should be. The absurdity safety valve is reserved for truly exceptional cases, and mere oddity does not equal absurdity.'" (quoting *Combs*, 401 S.W.3d at 630)).

that allow for the orderly sorting of the meritorious from the unmeritorious and the traditional rules for the allocation of attorney's fees are abandoned based on distinctions untethered and antithetical to the purposes of the TCPA—such as whether only one defendant or two acted to commit a civil injury. That approach strikes us as assuming that the legislature opted to protect citizen participation by using not a hand grenade but the other weapon where close is good enough—an atomic bomb.

**E. The Conflict Between Our Holding and Those of Other Courts of Appeals**

As we have just telegraphed, our holdings arguably conflict with several opinions from the Austin Court of Appeals. Specifically, the Austin court has held that the TCPA's right of association encompasses claims for trade-secret misappropriation, conspiracy to misappropriate trade secrets, and tortious interference. *See Grant v. Pivot Tech. Sols., Ltd.*, 556 S.W.3d 865, 881 (Tex. App.— Austin 2018, pet. filed); *Craig v. Tejas Promotions, LLC*, 550 S.W.3d 287, 296–97 (Tex. App.—Austin 2018, pet. filed); *Elite Auto Body*, 520 S.W.3d at 205–06.[8] The holdings

---

[8]Other courts have relied on the holdings of the Austin court to apply the TCPA to conspiracy claims:

Similarly, allegations that Appellants "secretly conspired among themselves" to "devise and implement wrongful and unlawful schemes" to misappropriate WSP's trade secrets, fraudulently transfer WSP assets and trade secrets, engage in unfair competition, and tortiously interfere with WSP's existing contracts and prospective business relationships" also necessarily involved a "communication." *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.001(1); *see also* [*Craig*, 550 S.W.3d at 296–97]

of the Austin court do not address the definition of "common" and instead focus on the definition of the word "communication."  Though the result of those cases is different than our own, they do not analyze the central question we discuss.

As noted, the self-described linchpin of the Austin court's analyses focuses on the Act's definition of "communication" and apparently assumes that the interest of the tortfeasors was a common one under the TCPA:

> The linchpin of our *Autocraft* analysis was that the Texas Supreme Court's TCPA precedents instructed that we apply a "plain-meaning" construction of the Act's broad terms that, at least with respect to the movant's initial burden, operates largely independently of and extends considerably beyond the [constitutional] "right of association," "speech," or "petition" that might otherwise have informed the meaning of those terms. *Consequently, it was enough that Precision had alleged conduct by Autocraft*

<hr />

(determining that conspiring to misappropriate trade secrets involved a TCPA communication).

*Gaskamp v. WSP USA, Inc.*, No. 01-18-00079-CV, 2018 WL 6695810, at *12 (Tex. App.—Houston [1st Dist.] Dec. 20, 2018, no pet. h.); *see also Morgan v. Clements Fluids S. Tex., Ltd.*, No. 12-18-00055-CV, 2018 WL 5796994, at *3 (Tex. App.—Tyler Nov. 5, 2018, no pet.) ("Applying these definitions to Clements'[s] pleadings, we conclude that Clements'[s] misappropriation of trade secrets claim is 'based on, relates to, or is in response to,' at least in part, Appellants' 'communications' among themselves and others within the Greenwell and ChemCo enterprise through which they have allegedly shared or utilized the information to which Clements claims trade secret protection.") (citing *Elite Auto Body*, 520 S.W.3d at 198).  At least one other court has reached the same conclusion without citing the cases from the Austin court. *See Abatecola v. 2 Savages Concrete Pumping, LLC*, No. 14-17-00678-CV, 2018 WL 3118601, at *8 (Tex. App.—Houston [14th Dist.] June 26, 2018, pet. filed) (mem. op.) (not citing authority from Austin Court of Appeals but holding that "with respect to MacDonald's hiring, this communication was made by individuals who 'join[ed] together to collectively express, promote, pursue, or defend common interests,' the common interests being the business of Hi-Tech, or as 2 Savages alleged, Hi-Tech 'conspired with Defendant Chad MacDonald to violate and interfere with the Non-Compete Contract between himself and 2 Savages'").

*that would fall within this plain-meaning reading of the TCPA's definition of "communication" (which is not explicitly limited to constitutionally protected expression, but "includes the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic") and, in turn, the "exercise of the right of association" (a "communication," so defined, "between individuals who join together to collectively express, promote, pursue, or defend common interests[,"] inasmuch as the individual conspirators had allegedly made the complained-of "communications" between themselves to further Precision's rival business.*

*Craig*, 550 S.W.3d at 294–95 (emphasis added and footnotes omitted).  The Austin court's statement relies on the same supreme court opinions that we have cited, which warn against superimposing the nuances of First Amendment jurisprudence on the TCPA's statutory definitions.  *See id.* at 294–95 nn.30, 31.

But the supreme court precedent cited by the Austin court does not foreclose our holding that chooses between a narrow and a broad definition of "common." Those cases focus on the exercise of free speech and chastise the courts of appeals for looking beyond the statutory definition of whether a statement related to a matter of public concern as defined in the TCPA.  *See Adams*, 547 S.W.3d at 896 (rejecting court of appeals's analysis that the communications did not involve a matter of public concern); *ExxonMobil II*, 512 S.W.3d at 901 (holding that the statements related to a "matter of public concern" because "they concerned Coleman's alleged failure to gauge tank 7840, a process completed, at least in part, to reduce the potential environmental, health, safety, and economic risks associated with noxious and flammable chemicals overfilling and spilling onto the ground"); *Lippincott*, 462 S.W.3d at 509 (holding that court of appeals erred by finding that the definition of

36

"communication" protected only public communication and concluding that communication dealt with a matter of public concern); *see also Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017) (clarifying that "[w]hen it is clear from the plaintiff's pleadings that the action is covered by the Act, the defendant need show no more").

None of these cases addresses the specific question of what the word "common" means in section 27.001(2) of the TCPA.

## F. The Holdings of Courts of Appeals that Apply the Right of Association to Group Interests

Some holdings in opinions applying the right of association are more consonant with our own than the ones just discussed. These cases apply the right of association where the interest of a group is at play.[9] We cite these cases to show the

---

[9]*Green v. Port of Call Homeowners Ass'n,* No. 03-18-00264-CV, 2018 WL 4100855, at *9 n.17 (Tex. App.—Austin Aug. 29, 2018, no pet. h.) (mem. op.) ("The defendants are a homeowners' association and its members and the alleged agents of the association. The TCPA applies to legal actions based on, related to, or in response to a party's exercise of the right of association."); *Campone v. Kline*, No. 03-16-00854-CV, 2018 WL 3652231, at *7 (Tex. App.—Austin Aug. 2, 2018, no pet.) (mem. op.) (holding that appellees showed that appellants' claim was based on appellees' exercise of the right of association as members of a spiritual community); *Roach v. Ingram*, 557 S.W.3d 203, 219 (Tex. App.—Houston [14th Dist.] 2018, pet. filed) (concluding that Judicial Defendants had satisfied their statutory burden to show that Parents' lawsuit was based on, related to, or was in response to the Judicial Defendants' "exercise of the right of association as members of the Juvenile Board engaging in communications 'between individuals who join together to collectively express, promote, pursue, or defend common interests'"); *Long Canyon Phase II & III Homeowners Ass'n, v. Cashion*, 517 S.W.3d 212, 226 (Tex. App.—Austin 2017, no pet.) (Pemberton, J., concurring) (stating that the majority "reasons that an HOA's members 'join together to collectively . . . promote, pursue, or defend common interests,' an accurate assertion if one assumes that such organizations serve to advance collective neighborhood welfare and not merely competing sides of the petty

focus of many courts on group interests to underpin the "common interests" referenced in the TCPA's definition of "the right of association." We acknowledge that none of these cases duplicate our effort to glean the meaning of "common" or necessarily support our holding other than to assume that "common interests" are shared by a group.

---

personal squabbles sometimes seen within them"); *Apple Tree Café Touring, Inc. v. Levatino*, No. 05-16-01380-CV, 2017 WL 3304641, at *3 (Tex. App.—Dallas Aug. 3, 2017, pet. denied) (mem. op.) (holding that Facebook and Twitter "discussions about Badu and her career and artistic endeavors fall under the 'right of association' as they are communications between individuals who join together to collectively express, promote, pursue, or defend common interests in Badu and her career"); *Fawcett v. Grosu*, 498 S.W.3d 650, 657 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (op. on reh'g) ("It is undisputed that all of the parties, as members of Masons, have joined together to collectively express, promote[,] or defend common interests."); *Fawcett v. Rogers*, 492 S.W.3d 18, 24 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (op. on reh'g) (same); *Backes v. Misko*, 486 S.W.3d 7, 20–21 (Tex. App.—Dallas 2015, pets. denied) ("These types of discussions clearly fall under the 'right of association' as they were 'communication[s] between individuals who join[ed] together to collectively express, promote, pursue, or defend common interests' within the horse community."); *Neyland v. Thompson*, No. 03-13-00643-CV, 2015 WL 1612155, at *4 (Tex. App.—Austin Apr. 7, 2015, no pet.) (mem. op.) ("The evidence shows that HOA members share common interests, such as ownership of the Sunchase 'Common Elements' and 'Common Expenses.'"); *Herrera v. Stahl*, 441 S.W.3d 739, 743 (Tex. App.—San Antonio 2014, no pet.) ("There is no dispute in this appeal that the Association is a group of 'individuals who join together to collectively express, promote, pursue, or defend [the] common interests [of the Chesapeake Condominium owners].'"); *Combined Law Enforcement Ass'ns of Tex. v. Sheffield*, No. 03-13-00105-CV, 2014 WL 411672, at *5 (Tex. App.—Austin Jan. 31, 2014, pets. denied) (mem. op.) ("In the statute's terms, these were communications between individuals who joined together in CLEAT to collectively express, promote, or defend the common interests of police officers.").

### G. Antero's Argument that We Do Not Reach

Antero urges us to resolve this case by concluding that its causes of action and the underlying communications between Kawcak and his alleged co-conspirator are not sufficiently related to implicate the TCPA. Antero supports this argument with our precedent, which holds that simply alleging conduct that has a communication embedded within it does not create the relationship between the claim and the communication necessary to invoke the TCPA. *See Smith v. Crestview NuV, LLC*, No. 02-18-00220-CV, 2018 WL 6215763, at *4 (Tex. App.—Fort Worth Nov. 29, 2018, pet. filed) ("Although Smith testified at his deposition that he and Armstrong had discussions about the product, these discussions are not the basis of Crestview's narrow claim against him. The practical effect of Smith's position—any action he took as an aider under the [Texas Security Act] necessarily involved communications—would seem to extend the definition of communication, and thus the reach of the TCPA, to noncommunications.").

Our opinion in *Crestview NuV* acknowledged the Austin's court's holdings in *Craig* and *Elite*, stating that "in those cases, the plaintiffs specifically alleged that the defendants improperly disclosed protected information to others, leading to the conclusion that those plaintiffs had alleged a communication as that term is defined in the TCPA." *Id.* (citing *Craig*, 550 S.W.3d at 295–96; *Elite*, 520 S.W.3d at 197–98). As we noted in the description of the allegations made in Antero's petition, one aspect of Antero's claim is that Kawcak passed confidential information to the Tommy

Robertson companies to aid their alleged "scheme." In the face of this allegation, we likely could only sustain Antero's argument if we rejected or distinguished the Austin court's holdings mentioned in *Crestview NuV*. Our holding allows us to resolve this case without going to that length.

## VII. Conclusion

Our opinion is long but our holding is narrow: the plain meaning of the word "common" in TCPA section 27.001(2)'s definition of "the right of association" requires more than two tortfeasors conspiring to act tortiously for their own selfish benefit. Because Kawcak acknowledges that his invocation of the TCPA assumes a definition of "common" at odds with our holding, we overrule Kawcak's dispositive first issue, which argues that the trial court erred by denying his TCPA motion. We do not reach his remaining issues.[10] *See* Tex. R. App. P. 47.1 (requiring appellate court to hand down a written opinion that disposes of every issue necessary to final disposition of the appeal). Accordingly, we affirm the trial court's denial of Kawcak's TCPA motion to dismiss.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: February 21, 2019

---

[10]The fact that the TCPA should not have been invoked at all in response to Antero's claims obviates the need to examine challenges directed at how the trial court resolved the TCPA motion to dismiss filed by Kawcak.

40